**Curtis J. MOORE, Appellee,**

v.

**Gerard BALLONE, Superintendent, Central State Hospital; James P. Mitchell, Virginia State Penitentiary, Appellants.**

**No. 80–6584.**

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 8, 1981.
Decided Aug. 20, 1981.

WINTER, Circuit Judge:

Curtis Jasper Moore petitioned for a writ of habeas corpus under 28 U.S.C. § 2254 (1976), alleging that his criminal convictions in a Virginia state court were obtained through the use of evidence procured during a custodial interrogation conducted by the police in violation of his rights under the fifth and sixth amendments to the Constitution. The district court, 488 F.Supp. 798, granted the writ and the Commonwealth of Virginia appeals. We affirm.

## I.

Moore was convicted of the rape and murder of an 88 year-old woman, Eva King Jones, at her home near the police station in Emporia, Virginia, in the Circuit Court of the Commonwealth of Virginia for Greensville County. The police discovered nothing at the home of the deceased and received no information that linked the crimes to Moore in their immediate aftermath. However, before she died, Mrs. Jones stated that she had been attacked by a black male. The police, lacking investigative leads, conducted a "dragnet" operation during which they brought approximately twenty black men to the stationhouse and questioned them about the crime over a period of six days. The men so questioned generally had been previously suspected of "peeping tom" incidents, attempted rape, or other unsavory behavior.[1] Significantly, Greensville County Sheriff Sasser conceded at the hearing on a motion to suppress the evidence obtained from the interrogation of Moore that the police had no record of any kind of criminal activity for which Moore was suspected.

Six days after Mrs. Jones's murder, on January 8, 1975, the police received complaints about Moore's odd behavior at the Skippers, Virginia, Post Office and at a nearby inn. Sheriff Sasser ordered one of his deputies and an Emporia policeman to

Robert E. Bradenham, II, Asst. Atty. Gen., Richmond, Va. (Marshall Coleman, Atty. Gen. of Va., Richmond, Va., on brief), for appellants.

Robert P. Geary, Richmond, Va. (Geary & Davenport, Harvey Latney, Jr., Richmond, Va., on brief), for appellee.

Before WINTER, RUSSELL and ERVIN, Circuit Judges.

---

1. Sheriff Sasser testified at the suppression hearing that:

 Everybody in this area that we would have any problem with for anything else we brought in we would question them about. We went back to find out, we checked on peeping toms, different things like this. We just questioned everybody because we had nothing.

pick up Moore and bring him in for questioning around 3:30 p. m. The sheriff conceded that he did not question Moore about these complaints. Instead, he testified that Moore was "hauled in [to] find out who he was and where he was from."

The police officers did not arrest Moore. They asked him to accompany them to the Emporia police station for questioning. To do so Moore had to abandon the bicycle he was riding at the time and ride approximately ten miles into town in a police car. Upon arrival at the stationhouse he was taken into a rear room, where a tape recorder had been set up. At least four police officers were present in the room throughout most of the ensuing interrogation. The sheriff testified that he conducted most of the questioning. After he had gathered some background, he began questioning Moore about the circumstances relating to Mrs. Jones's murder. At some point in this questioning the tape recorder was engaged. The tape recording produced, which was part of the record at every stage of this case, is well over an hour in length. It reflects continuous questioning, not only by the sheriff but by other police officers as well. The sheriff admitted that Moore was never informed during the course of the interrogation that he was free to leave. The sheriff's belief that Moore was "free to leave" was based entirely on the lack of

charges for which to hold him. The sheriff also learned that afternoon that Moore had required hospitalization for mental problems, and indeed he questioned Moore at some length about it.

Under circumstances we have described, the police conducted a prolonged interrogation of Moore. He asked when his mother would arrive to pick him up and was told that it would take a few minutes, although it took much longer despite the fact she had to come only ten miles. He then asked how many more questions would be asked, and was told again it would only take a few more minutes, to which he responded, "no, I'm tired now." The sheriff merely told him, "I am too, that's two of us, Curtis," and continued the interrogation. Shortly thereafter Moore became unresponsive again, and stated "I go home," to which the sheriff replied, "Nobody is going to hurt you. We just want to talk, want you to tell us about last week, ok?" Some time later, the sheriff asked Moore if he wanted to go home, Moore said yes, and the sheriff told him, "Well, come on and tell me about it then and we'll go." When Moore continued to say, "I don't know nothing," the sheriff continued to tell him that they would go home after Moore talked. As Moore apparently grew more unresponsive, the sheriff repeated *fifteen* times that if Moore talked he could go home.[2] Still later, exasperated,

2. The relevant exchange follows:
 Sheriff: Did you go down and wait for her at the house?
 Moore: Nope, I wait for nobody.
 Sheriff: You know, you know you went on down and waited, Curtis. Why don't you go and tell us about it so we can take you on home. You want to tell us about it? Come on and tell us about it so we can take you on home. Ok? Go ahead and tell us now and then we all won't have to sit here a long time, so we can take you on home. Go ahead and tell us what happened now. Go ahead and tell us so we can take you on home, ok? Come on and tell us what happened now. Come on and tell us so we can take you on home. It's raining, so you can go on home and watch television and go to bed. You want to tell us about it? Come on and tell us Curtis, so we can take you on home. Hadn't you rather tell us than anybody else? Huh? Come on and tell us, you've got to tell somebody about it, you might as well tell us. Go ahead and tell us

what happened now. Go ahead and tell us Curtis. Tell us exactly what happened so we can take you home, ok? Tell us what happened after you met her last week on the street. Come on and tell us so we can take you on home. We want to go home, too. Ok? Just go ahead and tell us exactly what happened. Come on so we can go home.
 Moore: I don't know nothing.
 Sheriff: Come on and tell us Curtis. You're ready to tell us now, go ahead and tell us so we can go home, ok? Tell us what happened. Curtis? Curtis, go ahead and tell us what happened so we can go home, ok? And so you can go home. Come on and tell us, then we can go get something to eat, ok? We know you didn't, we know you didn't mean to hurt her or nothing, just tell us what happened, ok? Go ahead and tell us. We know you didn't mean to, just tell Lieutenant Daugherty and myself, we're going to sit here and listen at you, exactly what you say and we're not going to say anything to you, just go ahead and tell us what happened.

the sheriff told him, "You tell me what happened. We're tired of messing around here now. We're ready to go home. Tell me what happened so you can go home too." Finally, Moore told the sheriff he was sleepy, indicated he wanted to go home, but was again told he could go when he told the police what happened the night of the murder.

Moore asserts that he was never advised of his constitutional right to remain silent under the fifth amendment and his right to the assistance of counsel under the sixth amendment as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Commonwealth concedes that it did not so advise him at the beginning of his interrogation, but contends that the sheriff eventually informed Moore of his constitutional rights before Moore inculpated himself in the crime.

The warning prescribed by *Miranda* was not recorded on the tape of the interrogation, nor did the police secure any document executed by Moore reflecting that he had been informed of and understood his rights. The sole evidence that the police advised Moore of his rights is the testimony of Sheriff Sasser. Moore did not testify at the suppression hearing, but the contemporaneous recording of the interrogation, which the state judge listened to, supports his contention.

The record is unclear as to precisely when the sheriff claims that he gave Moore the required notice. The state judge found the sheriff did so "before [Moore] ever made any admission of going to [Mrs. Jones's] house." The sheriff testified that it occurred approximately an hour after the taped interrogation began. He had begun to suspect that Moore had committed the crime, so he left the room and called the Commonwealth's Attorney, who was not available, and then called the City Attorney, who advised the sheriff to notify Moore of his constitutional rights, which the sheriff allegedly did when he returned to the interrogation room. Moore also allegedly said that he understood his rights at that time, and agreed to continue talking to the police officers. The sheriff stated that this incident occurred just prior to taking Moore to Mrs. Jones's house that evening. They went there twice, the first time at approximately 9:30 p. m. At the trial, but not at the suppression hearing, the sheriff stated that he accordingly must have called the Commonwealth's Attorney and the City Attorney around 8:30 or 9:00 p. m.

No evidence in the record accounts for the discrepancy between the sheriff's testimony that he began the interrogation around 3:30 p. m. or 4:00 p. m., that his interrogation of Moore is contained on the tape, that he notified Moore of his constitutional rights approximately one hour after he began the interrogation, and his testimony that this notice was given shortly before the first visit to Mrs. Jones's house, which undisputedly occurred at approximately 9:30 p. m.

Moore: Palotine, Palotine, where have you been? (Singing)
Sheriff: Curtis, Curtis, look at me. Curtis, look at me. You ready to go home?
Moore: Uh huh.
Sheriff: Well, tell us what happened then.
Moore: I don't know nothing.
A little later, the Sheriff, exasperated, engaged in the following exchange:
Sheriff: I don't know where Palotine been but I know where you're going. Don't you?
Moore: I don't know nothing.
Sheriff: Yes you do know something. Do you know what else? Curtis, you know something else?
Moore: What?
Sheriff: Look at me. Look at me.
Moore: What?

Sheriff: Look at me, you see me.
Moore: Yeah.
Sheriff: You know something else?
Moore: What?
Sheriff: You're not half as damn nuts as you act like you are, you know that? You know what happened last week, don't you? Huh?
Moore: Not sure.
Sheriff: Oh yes you do know. Now, you tell me what happened last week.
Moore: I don't know.
These exchanges occurred while the Commonwealth contends Moore was not in custody, was free to go at any time, and before the Sheriff had formed sufficient suspicion of Moore's complicity to consult local legal officials about notifying Moore of his *Miranda* rights.

It is not clear, moreover, at what point in the interrogation the *Miranda* warning was given, irrespective of time. Moore's "admission" placing himself at the Jones residence the night of the murder that the sheriff testified occurred after the warning was given may refer to a discussion on the tape or to admissions made by Moore on the first visit to the house.

The tape of Moore's questioning indicates that the sheriff left the room about twenty minutes into the interrogation, returning about five minutes later. Nothing on the tape suggests any break in recording, and at that point, despite intense questioning by the sheriff and other officers pointedly asking Moore about a sexual encounter with the woman, Moore had still admitted little more than seeing a woman on the street with an overcoat and pocketbook. Entirely consistent with the sheriff's testimony about the interrogation, Moore finally admitted, after approximately forty-five minutes of relentlessly repetitive leading questioning, that he did have a sexual encounter on the night of the murder, and approximately five minutes later he admitted that he had visited a woman's house, which the police suggested was the victim's house. Shortly after one hour of interrogation, Moore agreed to accompany Sheriff Sasser and other police officers to the victim's house. The tape is audibly shut off by a police officer who states, "end of part one, police station." Given the lack of any previous discernible break in the tape, and the Sheriff's own testimony, the only plausible time the *Miranda* warning could have been given was at the time the officers took Moore from the interrogation room and escorted him to the Jones residence across the street.

## II.

We need not decide whether any *Miranda* warning was actually given,[3] because the record starkly demonstrates both

the failure of the police to give the warning sufficiently timely to protect Moore's constitutional rights to remain silent and to the assistance of counsel and their failure to secure a "knowing and intelligent" waiver of his rights. In a collateral attack on a state conviction in federal court by petition for writ of habeas corpus under 28 U.S.C. § 2254, the state court's findings of fact are presumptively valid, but can be rebutted by "convincing evidence that the factual determination . . . was erroneous." *Id.* § 2254(d); *see Sumner v. Mata*, 449 U.S. 539, 550, 101 S.Ct. 764, 771, 66 L.Ed.2d 722, 734 (1981). Moreover, in reviewing the state court's conclusions of law, "it is necessary for the protection of federal rights that a federal court make an independent determination of the legal effect of the facts upon which rest a claimed violation of a federal right." *Hamric v. Bailey*, 386 F.2d 390, 393 (4 Cir. 1967); *see Napue v. Illinois*, 360 U.S. 264, 272, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959), even though under § 2254(d) and *Sumner v. Mata, supra*, the findings of the state court may be presumptively correct. In this case the state court decided that the evidence obtained from the interrogation of Moore would be admissible at his trial, concluding:

> [T]he defendant was picked off the street in the investigation of some other matter involving Skippers and also the Ramada Inn. He was brought to the Emporia Police Department and during the course of that investigation the defendant was interrogated along the Jones' matter. The Sheriff learned that the defendant had seen a person bearing the description of the victim in the Jones case. At no time during that investigation had the defendant made any admissions affecting his guilt. During that investigation he was not in the custody of the police. He was with them, he could have walked out at any time that he wanted to. There was nothing to prevent him from doing it, the Sheriff said that he could leave

---

**3.** The district court found that there was inadequate evidence in the record to support a finding that the *Miranda* warning had in fact been given, that even if a warning had been given it

was not given at the proper time, and that in any event there was little or no evidence in the record that Moore had waived his rights.

any time. He didn't communicate that to the defendant. This was during the investigatory stage of the Jones' murder case, at a time when the Sheriff believed that this investigation might center upon this particular defendant that he would probably have to accuse him, at that time he made the warning. The motion to suppress is overruled.

After reviewing the record in this case, we hold this finding defective in several respects. To the extent it represents a finding of fact, we think convincing evidence establishes that it is clearly erroneous; to the extent it constitutes a conclusion of law, we think the state court applied an incorrect standard.

The key finding was that Moore "was not in the custody of the police," because the Commonwealth acknowledges that *Miranda v. Arizona, supra,* requires the police to notify a suspect of his constitutional rights before proceeding with a "custodial interrogation." The Commonwealth attempts to rely upon a distinction between *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and *Miranda,* emphasizing *Escobedo*'s requirement that the defendant be the "focus" of the investigation. *Escobedo* holds that "when the process shifts from the investigatory to the accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and ... the accused must be permitted to consult with his lawyer." 378 U.S. at 492, 84 S.Ct. at 1766. *Miranda* suggests the equating of "focus" and "custodial interrogation," stating that police questioning of a person after he has been taken into custody "or otherwise deprived of his freedom of action in any significant way," 384 U.S. at 444, 86 S.Ct. at 1612, is what the Court meant by an investigation that had focused on the accused in *Escobedo, id.* n.4. The Commonwealth in this case concedes that the sheriff conducted an interrogation of Moore prior to giving him a *Miranda* warning, but contends that Moore was not in custody, essentially because he was not the "focus" of the investigation at the outset of the questioning.

We think this analysis misapprehends the meaning of *Miranda.* It incorrectly grafts the holding in *Escobedo* on to *Miranda* when the plain language and spirit of *Miranda,* confirmed in subsequent cases, suggest the converse. To permit the sort of intense police questioning of a potential suspect as was done under the circumstances of this case without timely apprising the individual of his constitutional rights and affording him an opportunity to avail himself thereof would upset the careful balance struck in *Miranda* and its progeny between individual liberties and the interest of society in the diligent investigation of crimes. *See Culombe v. Connecticut,* 367 U.S. 568, 577–87, 81 S.Ct. 1860, 1865–66, 6 L.Ed.2d 1037 (1961) (opinion of Frankfurter, J.).

The Supreme Court has strongly discounted the importance of investigatory "focus" on an individual in determining his entitlement to the notice of constitutional rights prescribed by *Miranda.* In *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), Internal Revenue agents questioned an individual they suspected of possible criminal violations of federal tax law at his home without giving him the full warnings required in *Miranda.* The Court held that *Miranda* did not apply to questioning found free of coercion conducted in a noncustodial setting. Chief Justice Burger, discussing the scope of *Miranda,* explained:

> The Court concluded that compulsion is "inherent in custodial surroundings," and, consequently, that special safeguards were required in the case of "incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights." In subsequent decisions, the Court specifically stressed that it was the *custodial* nature of the interrogation which triggered the necessity for adherence to the specific requirements of its Miranda holding.

425 U.S. at 345–46, 96 S.Ct. at 1615–16 (emphasis in original) (citations omitted).

The per se procedural requirement of *Miranda*, in this view, arises from the authoritarian environment to which a suspect is subjected in a custodial interrogation, not from the status of the investigation at the time the suspect is questioned. *Cf. Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) (stage of proceeding highly relevant in determining defendant's right to counsel under sixth amendment). Indeed, the holding in *Escobedo* is based on the accused's right to counsel under the sixth amendment, 378 U.S. at 491–92, 84 S.Ct. at 1765–66, not the privilege against self-incrimination under the fifth amendment. *See generally* Y. Kamisar, Police Interrogation and Confessions 161–63 and accompanying notes.

The Courts of Appeals generally concur that the *Miranda* notice requirements are not dependent upon whether the suspect is the "focus" of an investigation, but rather whether the suspect is in custody or has otherwise been deprived of his liberty in any significant way.[4] This court has previously noted that "[i]t is too well settled to admit of argument that *Miranda* warnings are only required for custodial interrogation." *United States v. Stanley*, 597 F.2d 866, 869 (4 Cir. 1979). We recognize that *Beckwith* and its progeny represent cases where the courts have rejected the *Miranda* claims of defendants upon whom investigations had focused because the interrogations at issue were not custodial. We think the rationale nonetheless applies with equal force to cases where the authorities claim no *Miranda* warnings were necessary merely because the investigation had not yet focused on the suspect. In both cases, the necessity for *Miranda* warnings turns solely upon whether the interrogation was custodial in nature.

The meaning of custody for purposes of *Miranda v. Arizona* was described by the Court as the "incommunicado interrogation of individuals in a police-dominated atmosphere" where a person had been "deprived of his freedom of action in any significant way." 384 U.S. at 445, 444, 86 S.Ct. at 1612. The classic example under *Miranda* involves interrogation of the person in a police stationhouse, just as Moore was interrogated here. The Commonwealth, however, relies heavily on *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). There the Court held that a suspect's consent to an investigatory interview at a state police office, where he was immediately told that he was not under arrest and where he in fact returned home after confessing to a crime during the one-half hour interview, did not constitute a custodial interrogation requiring *Miranda* warnings. 429 U.S. at 495, 97 S.Ct. at 714.

We think that *Mathiason* is clearly inapposite to this case. Moore did not come to the Emporia police station upon a polite request; he was, by the Sheriff's own testimony, "picked up" or "hauled in" for questioning by police officers off the street, driven some ten miles into town in a police cruiser. Once there, he was not taken into an office with a single officer, but was instead taken into an interrogation room where three or four officers were present at all times. He was not told he was under arrest, for the simple reason that the authorities lacked probable cause to hold him. From that the sheriff inferred that Moore was therefore free to leave the stationhouse at any time, despite the fact that he neglected so to inform Moore. The record is far more persuasive as to what the sheriff in fact said to Moore as opposed to what Moore might have inferred from the sheriff's silence. The sheriff stated, repeatedly,

---

4. *United States v. Jones*, 630 F.2d 613, 615–16 (8 Cir. 1980); *United States v. Jimenez*, 602 F.2d 139, 144–46 (7 Cir. 1979); *Borodine v. Douzanis*, 592 F.2d 1202, 1206 n.2 (1 Cir. 1979); *United States v. Bridwell*, 583 F.2d 1135, 1138 (10 Cir. 1978); *United States v. Haldeman*, 559 F.2d 31, 92 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *United States v. Lewis*, 556 F.2d 446, 448–49 (6 Cir. 1977); *see also United States v. Warren*, 578 F.2d 1058, 1072 (5 Cir. 1978); *United States v. Caiello*, 420 F.2d 471, 472–73 (2 Cir. 1969), *cert. denied*, 397 U.S. 1039, 90 S.Ct. 1358, 25 L.Ed.2d 650 (1970); *Lowe v. United States*, 407 F.2d 1391, 1393–94 (9 Cir. 1969).

that Moore could go home when he told the police what happened the night of the murder. He did not relent in his questioning until Moore began to incriminate himself after almost an hour of repetitive leading questions, which the sheriff admitted were about the murder of Mrs. Jones from the very outset. Unlike *Mathiason*, the sheriff conceded at the suppression hearing that he in fact had no intention of permitting Moore to return home if he confessed to the crime. Indeed, shortly after the night of the interrogation, Moore was committed to the Central State Hospital in Petersburg, where he has remained since. Finally, it is clear from the record that Moore was detained by the police that night continuously for at least five hours. Under these circumstances, we think it cannot be doubted that Moore was "in custody" for purposes of *Miranda* during his tape-recorded interrogation by the sheriff.

The recent case of *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), lends substantial support to this conclusion in our view. The case involved a claim of a fourth amendment violation, but the facts are closely similar to this case and the legal analysis is pertinent to this question under the fifth amendment. In *Dunaway*, the defendant was picked up and brought in for questioning at the police stationhouse after an unreliable informer supplied a vague lead connecting the defendant with a recent murder. As in this case, the officers drove the defendant to police headquarters in a police car and placed him in an interrogation room. They did not arrest him; indeed, as in this case, they lacked probable cause to do so. They nonetheless informed him of his *Miranda* rights, which he waived, and he eventually incriminated himself after an hour of questioning. The Supreme Court held the evidence obtained from the questioning inadmissible, stating:

> [T]he detention of petitioner was in important respects indistinguishable from a traditional arrest. Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was "free to go"; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody. The application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an "arrest" under state law. The mere facts that petitioner was not told he was under arrest, was not "booked," and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes, ... obviously do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions in *Terry* and its progeny [*Terry v. Ohio*, 392 U.S. 1 [, 88 S.Ct. 1868, 20 L.Ed.2d 889] (1968)]. Indeed, any "exception" that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are "reasonable" only if based on probable cause.

442 U.S. at 212–13, 99 S.Ct. at 2256–57 (citation omitted).

 It can be similarly said that the *Mathiason* exception to the general requirement that *Miranda* warnings be given prior to stationhouse interrogations would likewise threaten to swallow the general rule were it extended to thoroughgoing, incommunicado interrogations deemed "noncustodial" merely because the police lacked probable cause to arrest. The only distinction between the facts of *Dunaway* and this case is the contention that Moore was free to leave, although here too he was never so informed. As discussed above, we think that convincing evidence in the record renders that finding of the state court clearly erroneous. There is a close connection in our view between the interrogation under unlawful detention in *Dunaway* and the similar interrogation without notice of *Miranda* rights here. The question of what constitutes a "seizure" of the person under the fourth amendment is quite similar to the determination of "custody" triggering

rights under the fifth amendment. . It is at that point where the ordinary expectation of citizen cooperation with law enforcement authorities ends and the rights of citizens against government compulsion begins. The remedy for government violation of the citizen's rights against such compulsion is the same in both cases—exclusion of the evidence at trial tainted by the violation. *See Dunaway*, 442 U.S. at 217–18, 99 S.Ct. at 2258–59; *Brown v. Illinois*, 442 U.S. 590, 600–02, 95 S.Ct. 2254, 2260–61, 45 L.Ed.2d 416 (1975). We therefore think that *Dunaway* supports our view that the Commonwealth may not avoid its obligations under *Miranda* by characterizing its interrogation of Moore as an "investigation" merely by virtue of its lack of probable cause to arrest him.

Our conclusion is in accord with those lower courts that have formulated an "objective" test of whether a person is "in custody" for purposes of *Miranda*. *See, e. g., United States v. Scharf*, 608 F.2d 323, 325 (9 Cir. 1979); *Borodine v. Douzanis*, 592 F.2d 1202, 1206 (1 Cir. 1979); *Fisher v. Scafati*, 439 F.2d 307, 310 (1 Cir. 1971). There was a more than sufficient "objective manifestation" of custody, *Scafati*, 439 F.2d at 310, in this case. The officers picked up Moore off the street, forcing him to abandon his bicycle. They drove him some ten miles into town in a police cruiser. They took him into an interrogation room, where he was questioned for at least an hour incommunicado. He was detained by them at least five hours. In most cases, the intrusions on a person's freedom are far less comprehensive than they were in this case.[5]

The custodial interrogation of Moore conducted by the local authorities entitled him to notice of his constitutional rights under *Miranda v. Arizona* and the opportunity either to exercise those rights or to waive them knowingly and intelligently. The recorded questioning by the sheriff reflects his determination to induce Moore to incriminate himself from the very commencement of the taped interrogation. Within ten minutes of interrogation he attempted to secure Moore's admission that he had been to the victim's house on the night of the murder and had had sexual relations with her. The sheriff repeatedly returned to this subject until Moore did begin to implicate himself. Only then did the sheriff, according to his own testimony, notify Moore of his right to remain silent and his right to counsel. His failure first to notify Moore fatally tainted all the statements obtained theretofore; it also tainted all the statements obtained thereafter. The *Miranda* warning could not "cure" subsequent admissions because, as the sheriff testified, the police had no evidence linking the crime to Moore or anyone else prior to the interrogation; subsequent questions were necessarily based on the admissions illegally obtained previously. Moreover, there was not even a slight break between the questioning before the warning was given and afterwards. Moore was in continuous custody for at least five hours. He was not given any time to reflect; rather, he was given the warnings in the process of taking him to the scene of the crime for the purpose of inducing further self-incrimination. Indeed, even when his mother finally arrived at the stationhouse she was not permitted to confer privately with her son, but instead had her conversation tape-recorded in the presence of the sheriff and at least one other officer. The subsequent statements were thus the fruit of the poisonous tree. We think that the local police completely deprived Moore of the procedural safeguards that *Miranda* was designed to provide, and that his constitutional rights were therefore violated when the illegally obtained self-incriminating statements were

---

**5.** The Court of Appeals for the Fifth Circuit has formulated a more subjective test of custody for *Miranda* purposes. *See United States v. Montos*, 421 F.2d 215, 223 (5 Cir.), *cert. denied*, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970). The criteria considered are probable cause to arrest, subjective intent of the police, subjective belief of the defendant, and focus of the investigation. For the reasons discussed above, we think the objective standard is the better approach to the custody question. We nonetheless think that the outcomes can be reconciled under both approaches.

admitted against him at his trial. *See Brown v. Illinois*, 422 U.S. at 599–600, 604–05, 95 S.Ct. at 2259–60, 2262–63; *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963).

### III.

We also think that even had the *Miranda* warnings been timely given to Moore, he would nonetheless be entitled to the writ because clear and convincing evidence in the record persuades us that Moore did not knowingly and intelligently waive his privilege against self-incrimination and his right to counsel. The government bears a "heavy burden" of demonstrating such a waiver if interrogation of a suspect continues without the presence of an attorney after the suspect is notified of his rights. *Miranda v. Arizona*, 384 U.S. at 475, 86 S.Ct. at 1628. Accordingly, we think that a finding that the defendant waived his rights is implicit whenever a trial court admits a confession as in this case with an explicit finding that the defendant was notified of his rights. We thus reject the Commonwealth's contention that Moore is barred from raising the issue of waiver on appeal because he did not raise the issue at the hearing on his motion to suppress the confession. A knowing and intelligent waiver of constitutional rights is a necessary predicate to admission of a confession obtained through custodial interrogation.

The district court found that the Commonwealth had failed to meet its evidentiary burden of establishing in the state court that Moore in fact had waived his rights. At no time did Moore execute or otherwise assent to an express waiver of his rights. As the Supreme Court held in *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), however, an express waiver is not constitutionally required. *See also United States v. Robinson*, 593 F.2d 573, 577 (4 Cir. 1979). The Commonwealth must still rebut the presumption against waiver of rights, and it did so in this case only through the uncorroborated testimony of the sheriff, which

the district court found insufficient to overcome the presumption. The sheriff's testimony, although uncorroborated, was nonetheless unchallenged. However, we think that other evidence in the record convincingly demonstrates that Moore did not knowingly and intelligently waive his rights.

*Miranda* itself strongly suggests that any "waiver" agreed to by Moore on the night of the interrogation was invalid. The Court stated:

> Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege.

384 U.S. at 476, 86 S.Ct. 1629.

The instant case was characterized by both "lengthy interrogation" and "incommunicado incarceration" before Moore allegedly waived his rights. The police questioned Moore for at least an hour at the stationhouse before notifying him of his rights. Throughout that time they told Moore that he could go home as soon as he told them what happened. Their questioning reflects, and the sheriff conceded in his testimony, that they were fully aware that Moore had been previously hospitalized for mental problems. The confusion displayed by Moore on the tape, illustrated by his frequent singing of a verse of the theme song of a television series [6] in response to questions, unambiguously demonstrates his distorted mental condition. His continuous legal commitment to the state mental hospital since that time confirms this view. Finally, as Moore told his mother at the stationhouse after implicating himself at the victim's house: "I did tell the truth. Then

---

**6.** "The Ballad of Palladin," from *Have Gun, Will Travel.*

I said can I go home now?" Under these circumstances, any "waiver" agreed to by Moore "is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so" and "is inconsistent with any notion of a voluntary relinquishment of the privilege." 384 U.S. at 476, 86 S.Ct. at 1629.

The evidence in the record of Moore's mental condition, standing alone, should have sufficed for the state court to determine that he could not have knowingly and intelligently waived his rights. The Supreme Court has recently reiterated that it is incumbent on the state to demonstrate a knowing and intelligent waiver with some showing that the suspect was capable of understanding his rights. *Tague v. Louisiana*, 444 U.S. 469, 470, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980). This court has applied a test of "coherence, of an understanding of what is happening" in determining the validity of waivers where defendants claim mental impairment due to alcohol or drugs. *See, e. g., United States v. Smith*, 608 F.2d

1011, 1012 (4 Cir. 1979). Here, Moore's understanding and coherence should have been doubted by the officers during the interrogation; despite his requests for his mother, they continued to question him and apparently assumed he was competent to waive his rights. The state court, over a year later, had before it the additional evidence of medical diagnoses of Moore undertaken while he was committed at Central State Hospital. Even though Moore's sanity for purposes of the criminal law was disputed at trial, all the medical testimony concurred that he suffered from chronic schizophrenia. Given his mental history, and his lack of any experience with law enforcement procedures as would be derived from a criminal record, the evidence is overwhelming that any waiver he gave the officers was invalid. *See Cooper v. Griffin*, 455 F.2d 1142, 1144–45 (5 Cir. 1972); *cf. United States v. Glover*, 596 F.2d 857, 865–66 (9 Cir.), *cert. denied*, 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979) (defendant had criminal record).[7]

7. Moore's frequent requests for his mother during the interrogation supports our conclusion that he could not have knowingly and intelligently waived his rights. Moore, mentally impaired and living at home, was very much like a minor child; his behavior as reflected on the tape of the interrogation certainly resembles that of a child. The Supreme Court has held that the validity of a waiver of *Miranda* rights is determined by an inquiry into the "totality of the circumstances surrounding the interrogation," including an evaluation of the suspect's "age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979). The Court specifically declined to create any special rules for juveniles, stating that "[w]here the age and experience of a juvenile indicate that his request for his probation officer or his parents is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination," *id.*, while at the same time permitting a stricter approach to more case-hardened juvenile offenders, *id.* at 725–26, 99 S.Ct. at 2572. Accordingly, under the *Michael C.* rationale, the fact that Moore was not a juvenile is simply a factor to be weighed in determining whether

his request for his mother was an invocation of his constitutional rights, thus negating any "waiver" of those rights.

As discussed above, Moore had no criminal record and thus no experience with law enforcement procedures. The police were aware of his history of mental impairment and he demonstrated his impaired capacity throughout the interrogation. His requests for his mother, coupled with his stated unwillingness to talk to the officers, strongly suggest an attempt to invoke his constitutional rights to the extent his limited capacity enabled him to do so. *See People v. Burton*, 6 Cal.3d 375, 491 P.2d 793, 99 Cal.Rptr. 1 (1971). In view of the continued incommunicado interrogation, no valid waiver of his constitutional rights was possible under the totality of the circumstances. *See Commonwealth v. Jones*, 459 Pa. 286, 296–97, 328 A.2d 828, 832 (1974).

When Moore's mother finally did arrive at the Emporia stationhouse, he had already seriously implicated himself in the crime, both during the taped interrogation and during the immediately subsequent visit to the victim's house. He made further incriminating statements to his mother, which were recorded by the police. Her questions, however, were asked at the instance of the sheriff; and his admissions, as discussed above, represented the fruit of the prior incommunicado interrogation. His mother's presence for his additional incriminating remarks thus does not render

We therefore conclude that the Commonwealth failed to meet its heavy burden of establishing a knowing and intelligent waiver by Moore of his constitutional rights. Convincing evidence in the record clearly demonstrates that in view of the background, experience and conduct of Moore, he was not capable of intelligently deciding to relinquish his privileges and rights. It is very doubtful that he ever understood those privileges and rights. *See Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Consequently, the most damaging evidence against Moore at his state court trial was admitted in violation of his rights under the Constitution. The writ of habeas corpus properly issued.

AFFIRMED.

them admissible. *See Commonwealth v. McCutchen*, 463 Pa. 90, 343 A.2d 669 (1975).

In addition, there is nothing in the record to suggest that his mother was aware of the constitutional privileges and rights that were available to protect her mentally deficient son. Her questioning of Moore clearly indicates a desire to persuade him to exculpate himself. There is no indication that she understood that the statements he made would be used against him. Indeed, it was only with great reluctance that she agreed to the sheriff's forceful insistence that she accompany Moore and the police on a second visit to the victim's house, where he further incriminated himself. Under such circumstances, even his mother's presence could not have assisted Moore in reaching a knowing and intelligent decision to waive his constitutional rights. *See Commonwealth v. Starkes*, 461 Pa. 178, 335 A.2d 698 (1975); *In re Lawrence*, 29 N.Y.2d 206, 275 N.E.2d 577, 325 N.Y.S.2d 921 (1971). In the absence of a waiver, the statements obtained should not have been admitted against him at his trial.