**Arnold Lee VANCE, Petitioner,**

v.

**Donald E. BORDENKIRCHER, Warden, West Virginia State Penitentiary, Respondent.**

**Civ. A. No. 80–0097–E.**

United States District Court, N. D. W. Va., Elkins Division.

Jan. 12, 1981.

## MEMORANDUM ORDER

MAXWELL, Chief Judge.

Arnold Lee Vance, a prisoner at the West Virginia State Penitentiary, seeks, in this petition pursuant to 28 U.S.C. § 2254, to overturn his 1962 conviction of first degree murder, for which he is serving a sentence of life imprisonment.

The petitioner was fourteen years of age at the time the murders of which he stands convicted were committed, and was fifteen years of age at the time of his trial. One of his claims for relief, that he should have been treated as a juvenile rather than as an adult, has been dismissed for reasons stated in an earlier Memorandum Order filed August 11, 1980. In the same Memorandum Order, the Court denied the respondent's motion to dismiss which was based upon the ground that "[B]y coming forward eighteen years following his conviction, petitioner has severely prejudiced the State, bringing himself squarely within the scope of *Johnson v. Riddle*, 562 F.2d 312 (4th Cir. 1977)." The Court did, however, indicate that the instant petition would be dismissed for abuse of process unless the petitioner amended his petition by (1) explaining his failure to raise the claim that his confession was involuntary in any of the three previous habeas corpus petititons filed in this Court, or (2) showing that such failure was not deliberate, or (3) showing that such ground was not previously known to him.

The petitioner has amended his petition, asserting, in essence, that his failure to present the claim in question in prior petitions was the result of his low mentality and his inability to obtain legal advice except that from other inmates. The record of the trial substantiates that Vance is moderately mentally retarded (full scale IQ of 62), and the Court does not believe, under these circumstances, that the petitioner's failure to raise this issue previously can be construed as an abuse of the writ within the meaning of Rule 9(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Accordingly, the Court will address this claim on the merits, the respondent having acknowledged that the petitioner has exhausted his state remedies with respect thereto.

The plaintiff's trial took place in September, 1962. Therefore, neither *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) nor *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), are applicable in determining whether the petitioner's confession was illegally obtained. *Johnson v. New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). The voluntariness of the confession must be determined by examination of the totality of the circumstances. *Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959).

In order to view the totality of the circumstances surrounding the petitioner's confession in an understandable fashion, it is necessary to give a recitation of the factual background as developed at the trial.

On May 20, 1961, the bodies of Dr. Archer A. Wingrove and his housekeeper, Mrs. Georgia Broyles, were discovered at Dr. Wingrove's home near Scarbro, in Fayette County, West Virginia. Both victims had been shot in the head, and Mrs. Broyles had also been beaten about the head, as a result of which she had several lacerations and a fractured skull. The coroner was unable to establish the time of death of either victim, except to say that both had been dead for more than twenty-four hours. (Tr. 136). However, from the testimony of other witnesses, it was established that Mrs. Broyles was alive at 10:30 p. m. on May 18, 1961. The paper boy had collected his payment

from Mrs. Broyles on May 18, 1961, late in the afternoon, and at about 10:30 p. m. that night Mrs. Broyles' niece, Belle Snelson, spoke with her on the telephone. (Tr. 4–5 and 240–241). Although local and state police officers were continuing their investigations of the murders, as of March 29, 1962, no arrests had been made.

On the latter date, the petitioner had been arrested as a suspect in several breaking and enterings. (Tr. 87, 92). He was arrested at his home and was taken to the Oak Hill, West Virginia, city jail. The petitioner's mother was informed that he was being picked up for questioning, and did not accompany him to the jail. (Tr. 92–93). The petitioner told the chief of police that he was seventeen years of age, and the officer obtained permission from the judge of the juvenile court to place him in custody in the county jail. (Tr. 97). The chief of police acknowledged that he was aware that the petitioner was a student at a school for the mentally retarded. (Tr. 102).

The police chief testified that he advised the petitioner prior to questioning him about the breaking and enterings that he had the right to remain silent (Tr. 91–92), and that he had the right to be advised by counsel before making any statement. (Tr. 94). Chief Janney, while questioning the petitioner about the breaking and enterings, routinely asked him if he knew anything about the Wingrove-Broyles murders. (Tr. 88). This occurred in the police chief's office. The petitioner "acted a little funny" about the questions concerning the murders (Tr. 92), and Chief Janney had him put in jail, inasmuch as he had given a statement in connection with the breaking and enterings. Chief Janney then called Trooper C. A. Berkley of the West Virginia State Police, one of the officers involved in the Wingrove-Broyles murder investigation.

Trooper Berkley went to the Oak Hill city jail, and discussed the Wingrove-Broyles investigation with Chief Janney. (Tr. 100, 146). Chief Janney was not familiar with any of the particulars of the case, and Trooper Berkley acquainted him with some of the details in order to aid the chief in questioning the petitioner. (Tr. 100, 146–147). It was determined that Chief Janney would question the petitioner, with Trooper Berkley remaining in earshot, but out of sight.

The plan for questioning the petitioner was carried out, and Vance acknowledged that he and one Roger Belcher had gone to the Wingrove house, supposedly to try to borrow some money, and that the murders were committed while they were at the house, although he claimed that Belcher had actually done the shooting. Vance stated that he and Belcher took some jewelry and Dr. Wingrove's wallet, and that these items were divided between himself and Belcher. Both Chief Janney and Trooper Berkley testified that no threats, promises or inducements were made to Vance to obtain this confession, and that Vance did not appear to be nervous or emotionally upset at the time he gave the statement. (Tr. 84, 148–149).

After orally confessing to his participation in the murders, Vance was taken to the police chief's office, where the confession was reduced to writing, read to the petitioner and signed by him. (Tr. 157–166). Later the same night, Vance made a drawing of the floor plan of the Wingrove home (Tr. 223–232), and gave a second written statement. This confession was in conflict with the first in several particulars, the most important being that in the second written confession Vance stated that he, rather than Belcher, had shot Dr. Wingrove and Mrs. Broyles. Vance made yet another statement the next day.

On the afternoon of March 30, 1962, the petitioner had been taken to the state police office at Oak Hill. Trooper William F. Wiant of the West Virginia State Police testified that he was a polygraph examiner, and that Vance asked him to conduct a polygraph examination in order to verify the statements he had made previously. Trooper Wiant obtained an oral statement from the petitioner in order to assist him in conducting this polygraph examination. In this statement, Vance again stated that he had done the shootings. (Tr. 72).

The record shows that Vance was first taken to the Oak Hill city jail at approximately 4:45 p. m. on March 29, 1962. (Tr. 87). He was first asked about the Wingrove-Broyles murders at about 6:45 p. m., in Chief Janney's office. (Tr. 83). The first oral confession (the one overheard by Trooper Berkley) was obtained between 7:30 p. m. and 8:00 p. m., and the first written statement was taken at 9:15 p. m., although it was sometime later before Trooper Berkley completed reading it to Vance and it was signed. The record reflects that the petitioner did not make the drawing of the Wingrove home until 11:30 p. m., and the second written statement was not taken until 1:50 a. m. on March 30, 1962. According to Trooper Berkley's testimony, during the course of the evening, Vance had several soft drinks and some candy which he bought, and some coffee and sandwiches which were brought in to him. (Tr. 178). Trooper Berkley also testified that the questioning of the petitioner was intermittent, not constant, and that he did not appear to be sleepy or tired. (Tr. 178–180).

The Court does not believe, based upon the record, pertinent portions of which have been referred to above, that the petitioner's will was overborne by excessively constant questioning or by the lack of food, rest or sleep. This is particularly so because the initial confession was given early in the evening, after a relatively short period of questioning.

Of greater concern in determining the voluntariness of Vance's confession is his youth and his subnormal intelligence. Juvenile confessions must be scrutinized with special care, *Haley v. Ohio*, 331 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), but youth alone is not a *per se* ground for holding a confession inadmissible. *Williams v. Peyton*, 404 F.2d 528, 530 (4th Cir. 1968). Similarly, subnormal intelligence, although a significant factor in the "totality of the circumstances" equation for determining the voluntariness of a confession, will not, standing alone render an otherwise voluntary confession involuntary. *United States v. Young*, 529 F.2d 193 (4th Cir. 1975).

This case, of course, presents a combination of both of these factors—a confession by a fifteen year old youth who was moderately mentally retarded. Nevertheless, the Court does not believe this combination of factors calls for a *per se* finding of involuntariness.

Before admitting the written and oral confessions into evidence, the trial judge conducted scrupulously thorough voluntariness hearings out of the presence of the jury. Defense counsel were given very wide latitude in their cross-examinations of the witnesses. The trial judge was fully aware of Vance's age and his mental limitations, and had the opportunity to observe him during the course of the trial. In each instance, the trial court found that the confession had been made voluntarily. Voluntariness need be established only by a preponderance of the evidence, *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), and this Court is not prepared to say, upon reviewing a cold record, that these findings were erroneous.

Accordingly, for the reasons herein stated, the petition of Arnold Lee Vance for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 will be denied.