**Arnold Lee VANCE, Appellant,**

v.

**Donald E. BORDENKIRCHER, Warden, West Virginia State Penitentiary, Appellee.**

No. 81–6819.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 4, 1982.

Decided Nov. 12, 1982.

Rehearing and Rehearing En Banc Denied Feb. 3, 1983.

Robert E. Shepherd, Jr., Richmond, Va. (Richard D. Gates, Kathe Klare, Third Year Law Students, on brief), for appellant.

S. Clark Woodroe, Asst. Atty. Gen., Charleston, W.Va. (Chauncey H. Browning, Jr., Atty. Gen., Charleston, W.Va., on brief), for appellee.

Before WIDENER, SPROUSE and ERVIN, Circuit Judges.

WIDENER, Circuit Judge:

Arnold Lee Vance filed this habeas corpus petition pursuant to 28 U.S.C. § 2254 asserting that his 1962 conviction for first degree murder was the result of an involuntary confession. The district court denied the requested relief. *Vance v. Bordenkircher*, 505 F.Supp. 135 (N.D.W.Va.1981). We affirm.

I

On May 20, 1961, the bodies of Dr. Archer A. Wingrove and his housekeeper were discovered in Dr. Wingrove's home near Scarboro, West Virginia. Both victims had been shot in the head, and the housekeeper also had been beaten about the head. An extensive investigation by local and state police during the ensuing ten months failed to lead to any arrests. 505 F.Supp. at 135–37.

On March 29, 1962, petitioner Vance was arrested as a suspect in several breakings and enterings unrelated to the Wingrove murders. He was arrested at his home in Oak Hill, West Virginia and taken to the Oak Hill police station at approximately 4:45 p.m. The petitioner's mother was informed that he was being arrested, but she did not accompany him to the police station. The petitioner told the chief of police that he was 17 years old (even though he was only 15), and the chief obtained permission from the juvenile court to place him in jail. The chief acknowledged that he was aware that the petitioner attended a school for the mentally retarded.

The police chief testified that prior to any questioning he advised Vance that Vance had the right to remain silent and the right to be advised by counsel before making any statements. The chief proceeded to question Vance on the breakings and enterings and, at the conclusion of these questions, asked Vance, as a matter of routine, if he knew anything about the Wingrove murders. The chief testified that Vance "acted a little funny about it" when asked about the murders, so, following some additional questions, Vance was placed in jail pending further questioning. The latter questioning took place after the chief had called a state trooper who was investigating the murders. The trooper then listened in on the questioning of Vance but was out of sight.

It was during this questioning that Vance first revealed that he and another individual had gone to the Wingrove house intending to borrow some money. The murders happened instead, although, at this point in the questioning, Vance claimed that the other individual actually shot the victims. This statement, which was made between 7:30 and 8:00 p.m., was later reduced to a writing beginning at approximately 9:15 p.m. Questioning continued intermittently through the evening, and Vance eventually drew, or was assisted in drawing, a floor plan of the Wingrove home. During this period, Vance purchased several soft drinks and some candy, and also was brought coffee and sandwiches by the officers. The state trooper, who later joined the questioning, testified that Vance did not appear to be sleepy or tired during the questioning. Finally, Vance made a second statement on the events which transpired at the Wingrove home. In this statement, which was reduced to writing between 1:50 and 2:30 a.m., Vance stated that he, and not his companion, had actually shot Dr. Wingrove and the housekeeper. The state trooper and the Oak Hill police chief both testified that the various confessions were offered voluntarily, without any force or threat of force, and without any offer of reward or leniency, or any other inducement. The next day, Vance was taken to the state police station, where, at his request, he was given a polygraph examination. As part of this examination, Vance made a statement in which he again admitted the murders. Vance also made statements which amounted to confessions to a newspaper reporter and to an inmate at the jail, but these are not at issue.

At the ensuing trial, both written confessions and the oral confession were introduced into evidence. Prior to the introduction of each, the judge excused the jury and heard extensive testimony as to the voluntariness and circumstances surrounding the confessions. The judge decided that suffi-

cient groundwork had been laid for the statements and that the issue of voluntariness was a question for the jury. The jury was instructed to consider "all the circumstances under which the alleged confessions and admissions were made and determine their exact nature, import and meaning." The jury returned a verdict of first degree murder, and the petitioner was sentenced to life imprisonment.

The record does not disclose whether the conviction was appealed to the West Virginia Supreme Court. In 1970, a federal district court denied a habeas corpus petition by Vance which was based on a claim that Vance had been wrongfully denied protection of West Virginia statutes dealing with youthful offenders. In 1979, Vance petitioned the West Virginia Supreme Court for habeas corpus relief, which was denied, with two justices dissenting. The present action was brought in February 1980, and the district court denied the petition. *Vance v. Bordenkircher,* 505 F.Supp. 135 (1981). After evaluating the record, the district court concluded that it was not prepared to say that the findings of voluntariness were erroneous.

## II

The trial of Vance took place in September 1962 and thus neither *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), nor *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), are applicable in determining whether Vance's confession was obtained illegally. *Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). So the only question to be resolved is whether or not the confessions were voluntary. In resolving the question of whether a confession was the result of undue influence, we must independently determine the ultimate issue of voluntariness. *Thomas v. North Carolina,* 447 F.2d 1320, 1322 (4th Cir.1971). Furthermore, it is important to recognize that confessions by juveniles require special scrutiny by the courts. *Gallegos v. Colorado,* 370 U.S. 49, 52–53, 82 S.Ct. 1209, 1211–1212, 8 L.Ed.2d 325 (1962); *Haley v. Ohio,*

332 U.S. 596, 599, 68 S.Ct. 302, 303, 92 L.Ed. 224 (1948). Finally, the evaluation as to whether the confession was voluntary must be made on the basis of the totality of the circumstances surrounding the confession. *Gallegos,* 370 U.S. at 55, 82 S.Ct. at 1213; *United States v. Miller,* 453 F.2d 634, 635 (4th Cir.), cert. denied, 406 U.S. 923, 92 S.Ct. 1790, 32 L.Ed.2d 123 (1972).

The appellant has placed great emphasis on his mental capacity and physical age at the time of the confessions in order to demonstrate involuntariness. At the time, Vance was 15 years old. A psychiatrist testified that he had a full scale IQ of 62, with moderate mental deficiency, and a mental age of nine. Vance has also emphasized the length and conditions of the interrogation preceding the confession. While he has cited numerous cases where confessions by youthful or mentally retarded individuals have been held to be involuntary, none of these cases hold, as a matter of law, that the confessions are involuntary.

In *Miller v. Maryland,* 577 F.2d 1158 (4th Cir.1978), this court upheld the finding of voluntariness in the confession of a 16 year old to charge of murder. We noted, "But '[y]outh by itself is not a ground for holding a confession inadmissible.' *Williams v. Peyton,* 404 U.S. 528, 530 (4th Cir.1968)." 577 F.2d at 1159. Similarly, in *United States v. Miller,* 453 F.2d 634 (4th Cir.1972), we upheld the validity of a 14 year old's conviction for juvenile delinquency relative to the possession of stolen mail and the forging and uttering of stolen Treasury checks. We said:

> We are not prepared to hold that a boy of fourteen is never capable of making an intelligent waiver of his rights. Although the age of the individual is a factor to be taken into account in ascertaining if the waiver was voluntary, no court has held that age alone is determinative.

Id. at 636.

On the issue of mentally deficient individuals confessing to crimes, in *United States v. Young,* 529 F.2d 193 (4th Cir.1975), we

considered the voluntariness of, and held admissible, a confession to a charge of possession of stolen mail. We said:

> While defendant Young had a below-average I.Q., limited education and reading problems, these factors are not in themselves determinative of the voluntariness of a waiver, for one must examine the totality of the circumstances surrounding the waiver.

Id. at 195 (footnotes omitted).[1]

■ Looking at the totality of the circumstances in the instant case, we do not believe that it may be said that Vance's confession was involuntary. As noted above, his youth and intelligence level does not make the confession involuntary as a matter of law. Vance was advised of his rights not to answer any questions posed to him, yet he proceeded to answer questions on the breakings and enterings.[2] Unlike *Moore v. Ballone,* 658 F.2d 218 (4th Cir. 1981), and *Thomas v. North Carolina,* 447 F.2d 1320 (4th Cir.1971), there was no effort made to restrict Vance's access to outside adults during the questioning. Rather, his mother was made aware of the arrest and she voluntarily chose not to accompany him to jail.

Another important difference between this case and some finding confessions involuntary is that Vance's initial confession did not come at the end of an extended interrogation. E.g., *Gallegos v. Colorado,* 370 U.S. 49, 54, 82 S.Ct. 1209, 1212, 8 L.Ed.2d 325 (1962) (five day detention); *Thomas,* 447 F.2d at 1321 (14 hours of interrogation in a 17 hour period). While the second confession did not occur until several hours after the initial questioning, Vance's initial indication that he might know something about the murders came in response to a routine question during questioning about totally unrelated crimes and his acknowledgment came after a relatively short period of questioning. Furthermore, there is no indication in the record that Vance was denied food, that he was tired, or that he requested that questioning end. See, e.g., *Moore,* 658 F.2d at 221–22.

We think Vance's handling at the hands of the police altogether seems to have been quite proper, with no pressure, rough language, tricks, threats, inducements, or the like, used at all. Indeed, the chief of police told him: "Boy, if you didn't do that and don't know anything about it, don't you tell us that you did do it. Don't play any games. It is a serious thing." The principal fact which tends to show that the confessions may have been involuntary is Vance's mental capacity, but we think that, while the issue is not entirely free from doubt, the record does not support the conclusion that Vance did not realize what he was doing or that he confessed against his will. We have also considered especially Vance's age and the period of questioning. But the intermittent rather than sustained questioning, and youthful age, we think, together with all the other facts in the case will not support a finding of involuntariness absent overreaching of some kind on the part of the police which simply has not been shown. We are thus of opinion and find

1. The appellant argues that this court's decision in *Moore v. Ballone,* 658 F.2d 218 (1981), establishes a per se standard in this circuit against the admission of confessions by mentally deficient individuals. The present case, however, is clearly distinguishable from *Moore.* The basis for the appellant's argument is the statement in *Moore* that, "The evidence in the record of Moore's mental condition, standing alone, should have sufficed for the state court to determine that he could not have knowingly and intelligently waived his rights." 658 F.2d at 229. At issue in *Moore,* unlike the present case, was whether the state had met the "heavy burden" of proving that the petitioner had knowingly waived his *Miranda* right to counsel. Id. at 228. See *Miranda,* 384 U.S. at 475, 86 S.Ct. at 1628. Here, the inquiry is only whether the confession was voluntary, because, as noted above, Vance was not protected by the *Miranda* requirements. Furthermore, the *Moore* petitioner, unlike the petitioner here, asked unsuccessfully for the interrogation to end.

2. There is no evidence in the record contradicting the prosecution's witnesses as to what transpired during the questioning. Vance did not testify.

that Vance's confessions were voluntarily given.[3]

The judgment of the district court is accordingly

AFFIRMED.

ERVIN, Circuit Judge, dissenting:

I respectfully dissent.

Arnold Vance was fifteen years old at the time of his arrest and interrogation. He possessed an IQ of 62, a mental age of nine, and the reading ability of a first grader. He was taken into custody on March 29, 1962, at 4:45 p.m. for questioning about recent break-ins in his neighborhood. Prior to questioning he was told that he had the right to remain silent and the right to be advised by counsel. Intermittent interrogation then took place for the next nine hours. Early in the evening, Vance implied involvement in the May 20, 1961, murders of Dr. Archer Wingrove and his housekeeper. At 9:15 p.m., Vance signed a statement composed by police waiving his right against self-incrimination and admitting his participation in the murders. He maintained, however, that the murders were committed by his co-defendant, Roger Belcher. The questioning continued. Vance was fed soft drinks and candy; none of the officers later could recall if Vance had a solid meal during his nine hour interrogation, though one of them thought that sandwiches were provided him. Throughout this time, Vance was amiable and cooperative.

Finally, after midnight, Vance stated that he, not his companion, was the murderer of Dr. Wingrove and his housekeeper. At 2:30 a.m., Vance signed a revised statement to that effect.

Five and one-half hours later on the morning of March 30, 1962, Vance submitted to a polygraph examination and then was driven to the Wingrove residence for further questioning.

The sole issue for review is whether Vance's confession on March 30, 1962, was voluntary, or whether it constituted a violation of the fourteenth amendment to the Constitution, which provides that no state shall deprive any person of liberty without due process of law.

In my opinion, the totality of circumstances in this case will not support the conclusion that Arnold Vance's confession was voluntary within the requirements of fundamental fairness and due process. *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936). Arnold Vance was both a child and an individual with low mental faculties. He was subjected to nine hours of intermittent interrogation lasting deep into the night. No friend, parent or attorney was present to assist him. This configuration of circumstances repels the suggestion that Vance confessed voluntarily to the Wingrove murders.

At the outset, I suggest that there are two aspects to the evaluation of confessions under the fourteenth amendment. One is the behavior of police: did authorities employ techniques of physical or psychological abuse in order to obtain the confession?[1] In Vance's case we must consider the length of the interrogation,[2] the method of questioning,[3] and any deprivation of food or sleep.[4] On balance, I agree with the majority that these factors alone do not prove Vance's confession was coerced. However, there is a second aspect to our inquiry, namely, did Vance have the mental capacity to make a voluntary confession? Even where police pressure is minimal, we must

---

**3.** We note in passing that Vance was quite well represented at the criminal trial. His attorneys were alert and well prepared.

**1.** *See, e.g., Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936); *Chambers v. Florida,* 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1939); *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959).

**2.** *Gallegos v. U.S.,* 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962).

**3.** *Moore v. Ballone,* 658 F.2d 218 at n.2 (4th Cir.1981).

**4.** *Thomas v. North Carolina,* 447 F.2d 1320 (4th Cir.1971).

concern ourselves with whether the defendant possessed the capacity to comprehend his rights and to waive those rights by his confession.[5] In Vance's case, we must look particularly at age and mental development, and at the absence of counsel to assist him in his interrogation.

Nor are these inquiries mutually exclusive. Police techniques that might seem innocuous in themselves—such as nine hours of intermittent noncoercive questioning—may take on a different hue when their object is a fifteen-year-old of low intelligence without prior experience in dealing with police and without benefit of counsel.[6] In other words, it is the totality of circumstances—external circumstances of police behavior and internal circumstances of mental capacity—that guides our examination of the voluntariness of Vance's confession.

I believe that the majority fails to weigh the evidence in its totality. Instead, the court takes a piecemeal approach. For example, the majority correctly cites authority holding that age alone is insufficient to invalidate a confession that is otherwise not coerced. In *Miller v. Maryland*, 577 F.2d 1158 (4th Cir.1978), the court endorsed the confession of a sixteen-year-old, and in *U.S. v. Miller*, 453 F.2d 634 (4th Cir.1972), *cert. denied*, 406 U.S. 923, 92 S.Ct. 1790, 32 L.Ed.2d 123 (1972), a fourteen-year-old with a seventh grade education was found capable of waiving *Miranda* rights.[7] *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (statements made under custodial interrogation inadmissible absent use of procedural safeguards to secure privilege against self-incrimination). However, neither of these cases addressed the combination of youth and subnormal intelligence. The adolescents in *Miller v. Maryland* and

---

5. *Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960), is the seminal case on confessions and mental incapacity. In *Blackburn*, the defendant had a history of mental illness. He was subjected to nine hours of sustained interrogation without the presence of counsel and finally signed a confession composed by police. Aside from the lengthy uninterrupted questioning, the police employed no coercive techniques to induce his confession. Nevertheless, the Supreme Court held the confession involuntary, focusing on the psychological make-up of the mentally ill defendant:

"[T]his judgment can without difficulty be articulated in terms of the unreliability of the confession, the lack of rational choice of the accused, or simply a strong conviction that our system of law enforcement should not operate to take advantage of a person in this fashion." *Id.* at 207, 80 S.Ct. at 280.

In *Fikes v. Alabama*, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957), there was no evidence of physical brutality, yet the confession was held involuntary because, *inter alia*, defendant was of "low mentality," a "weaker and more susceptible subject" than had been involved in prior cases where identical police techniques were upheld.

6. "The limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing. What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal." *Stein v. New York*, 346 U.S. 156, 185, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522 (1953).

7. In validating the confession, the court stressed Miller's apparent understanding of his rights, noting that:

The mere recital of the form of official warning, or the presentation of a copy of the warning to be read, with no additional effort at clarification by the interrogating officer may not be enough in many cases to insure that a juvenile knows and understands the possible consequences of any statement he may make. Legal terminology such as the "right to counsel" or warnings that statements may be "used against you in court" should be carefully explained before accepting an affirmative answer to the bare question, "Do you understand your rights?" *Id.* at 636.

In marked contrast here, Vance did not demonstrate a comprehension of his rights or their waiver other than by signing the confession—a confession, it would appear, that he could not read. At no other time was he asked to show that he understood his right to remain silent. At trial, Vance's teacher testified that he could not have understood the meaning of the waiver of rights attached to his written confession. In *Tague v. Louisiana*, 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980), the Supreme Court held that it was incumbent on the state to demonstrate knowing and intelligent waiver by some showing that the suspect was capable of understanding his rights. This holding, of course, post-dates Vance's case, but it nevertheless illustrates the importance of demonstrations of comprehension of rights to the issue of voluntariness.

*U.S. v. Miller* both appeared to possess normal mental faculties.

The majority also cites authority holding that persons of very low intelligence are capable of making voluntary confessions. The defendant in *U.S. v. Young,* 529 F.2d 193, 195 (4th Cir.1975), had a "below average IQ, limited education and reading problems," but the court held these factors in themselves not determinative and concluded that the totality of circumstances surrounding Young's waiver of rights established voluntariness. In *Young,* the defendant when asked told authorities that he did understand his *Miranda* rights; subsequently, he read aloud in court much of the waiver form he had signed and repeated to the judge that he understood his rights.[8]

*Mosley v. Slayton,* 348 F.Supp. 1 (W.D. Va.1972) (cited in *Young,* but not by the majority), also upheld the waiver of rights by a person of limited mental faculties. Mosley had a seventh grade education and was known as a "slow learner." Prior to waiving his right to silence and right to counsel, Mosley was asked by authorities if he understood these rights, and he responded affirmatively.

*Young* and *Mosley* are distinguishable from the present case on two counts. First, the extent of the mental deficiency is not specified beyond the facts that Young was of "below average intelligence" and Mosley was a "slow learner." Vance, on the other hand, offered uncontradicted evidence that his IQ was 62 under the Wechsler Adult Intelligence Test, indicating moderate mental retardation. Second, and most important, neither Young nor Mosley appear to have been juveniles on the dates of their confessions; their ages were not mentioned by the courts which found them capable of making voluntary confessions.

I believe that the majority fails to acknowledge the importance of age in assessing the mental capacity of retarded individuals to render voluntary confessions. The courts have recognized the susceptibility of inexperienced juveniles to interrogation techniques.[9] Similarly, the vulnerability of individuals of low mentality to suggestions from authority figures is well-documented.[10] *In combination,* Arnold Vance's youth and mental infirmity present a picture of pliant eagerness to please his inquisitors. If Vance were older and emotionally more mature, or if he were more intelligent, I might discern in him sufficient presence of mind to execute a voluntary confession, but I cannot place my faith in the inculpatory statement of a juvenile with the mind of a nine-year-old.

I do not, however, rely solely on Vance's youth and mental impairment in weighing the constitutionality of his confession.[11] Additional factors are present in this case

---

8. *See* n. 7 *supra.*

9. *See, e.g., Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1947).

10. *See, e.g., Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957).

11. In *Moore v. Ballone,* 658 F.2d 218 (4th Cir. 1981), the court suggested that a severe mental handicap short of insanity might in and of itself be sufficient to invalidate a confession, stating that "[t]he evidence in the record of Moore's mental condition, standing alone, should have sufficed for the state court to determine that he could not have knowingly and intelligently waived his rights." *Id.* at 229. At footnote 1, the majority here dismisses *Moore* as easily distinguishable, claiming that the issue there was solely whether Moore had waived his *Miranda* right to counsel, while Vance was not protected by the *Miranda* requirements. In fact, the court in *Moore* was examining the defendant's waiver of both the right to remain silent *and* the right to counsel. At page 228 the court states:

> We also think that even had the *Miranda* warnings been timely given to Moore, he would nonetheless be entitled to the writ because clear and convincing evidence in the record persuades us that Moore did not knowingly and intelligently waive his privilege against self-incrimination and his right to counsel.

Obviously, the voluntariness of Vance's waiver of his right to remain silent is at issue here. Furthermore, it is disingenuous of the majority to spurn *Moore* because it focuses on waiver of *Miranda* rights, since two of the three principal cases relied upon by the majority (*U.S. v. Miller* and *U.S. v. Young*) precisely concern whether the defendant knowingly and intelligently waived *Miranda* rights.

which have been recognized by the courts as militating against a finding of voluntariness.

In *Gallegos v. U.S.*, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), the petitioner, age fourteen, made an oral confession as soon as he was arrested. He was informed of his right to counsel but did not ask to see a lawyer. After he had been detained by the police for at least five days, during which time he saw no lawyer, parent, or other friendly adult, he signed a formal confession. The Supreme Court held that under these circumstances, the formal confession was obtained in violation of due process. The age of the defendant and the length of the incarceration were what gave the case its "ominous cast," but the Court also stressed the absence of counsel:

> [The adolescent defendant] would have no way of knowing what the consequences of his confession were without advice as to his rights—from someone concerned with securing him those rights—and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself.... Without some adult protection against this inequality, a 14-year-old boy would not be able to know, let alone assert, such constitutional rights as he had. *Id.* at 54, 82 S.Ct. at 1212.

Although the Court did not go so far as to require the presence of counsel in all juvenile interrogation cases even where the youth appears to waive his right to an attorney, failure by police to bring in counsel or some other friendly adult cuts against the government's case that a confession was voluntary.[12] Where the susceptibility to police pressure is undoubtedly great, as in the case of a teenage boy with little past experience in dealing with authorities, the glaring failure of authorities to summon counsel is fundamentally unfair.

The majority states:

> Another important difference between this case and some finding confessions involuntary is that Vance's initial confession did not come at the end of an extended interrogation, *e.g., Gallegos v. Colorado,* 370 U.S. 49, 54 [82 S.Ct. 1209, 1212, 8 L.Ed.2d 325] (1962) (five day detention); *Thomas,* 447 F.2d 1321 (14 hours of interrogation in a 17 hour period). While the second confession did not occur until several hours after the initial questioning, Vance's initial indication that he might know something about the murders came ... after a relatively short period of questioning.

Leaving aside the question of what constitutes "extended interrogation,"[13] the majority's emphasis on Vance's inculpatory statements early on in the interrogation is misplaced in light of *Gallegos,* where, 370 U.S. at 54, 82 S.Ct. at 1212, the Supreme Court stated:

> The prosecution says that the youth and immaturity of the petitioner and the five-day detention are irrelevant, because the basic ingredients of the confession came tumbling out as soon as he was arrested. But if we took that position it would, with all deference, be in callous disregard of this boy's constitutional rights. He cannot be compared with an adult in full possession of his senses and

12. The Supreme Court of Vermont has recently considered the question of a juvenile's right to the presence of a guardian or responsible advisor. In *In Re E.T.C.,* 449 A.2d 937 (Vt.1982), the court invoked its state constitutional guarantee of counsel, stating that:

> Being free, as we are, to interpret the precise meaning of our own constitutional equivalent so long as no federal proscriptions are transgressed ... and recognizing the inability of a juvenile to choose, without advice, among alternative courses of legal action, we have approved the summoning of a juvenile's representative prior to questioning [in court]

and have held that a minor accused of a crime cannot waive counsel without a guardian or a responsible advisor.... [W]e now hold that the same principles apply to police interrogation of juvenile suspects. *Id.* at 939.

13. Nine hours of intermittent interrogation from five p.m. until two a.m. strikes me as "extended." *See Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1957) (confession obtained after five hours interrogation in the middle of the night invalidated in light of all the circumstances, including length of interrogation).

knowledgeable of the consequences of his admissions.

The majority concludes by commenting on the absence of police pressure, rough language, tricks, and threats or inducements in this case. But, as I have already noted, the Constitution does not invalidate only confessions extracted by physical torture[14] or intentionally inflicted psychological duress.[15] The inquiry to be made is whether the confession has been "the product of a rational intellect and a free will." *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960). I too find no objectionable tactics employed by Vance's interrogators. What I do find is a teenage boy with the mind of a child subjected to nine hours of intermittent interrogation without the benefit of counsel or adult support.[16] In *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), the Supreme Court reversed the conviction of a fifteen year old youth who, without being apprised of his right to remain silent and without the benefit of the presence of counsel, confessed to murder after five hours of questioning in the middle of the night. Justice Frankfurter in concurrence wrote:

> [W]hether a confession of a lad of fifteen is "voluntary" and as such admissible, or "coerced" and thus wanting in due process, is not a matter of mathematical determination. Essentially it invites psychological judgment—a psychological judgment that reflects deep, even if inarticulate, feelings of our society. Judges may divine that feeling as best they can from all the relevant evidence and light which they can bring to bear for a confident judgment of such an issue, and with every endeavor to detach themselves from their merely private views. *Id.* at 603, 68 S.Ct. at 305.

Chastened by this admonition, I conclude that Arnold Vance's confession was not an act of conscious volition, but one of unintelligent capitulation before the encouragements of police. I would reverse the district court and conditionally grant the writ of habeas corpus pending a new trial by the State of West Virginia.

---

**14.** *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936).

**15.** *See, e.g., Chambers v. Florida,* 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1939); *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959).

**16.** See *Williams v. Peyton,* 404 F.2d 528 (4th Cir.1968) (confession found to be involuntary where defendant was fifteen at time of arrest and enrolled in grammar school, had no prior criminal record, and was held incommunicado for at least three days during which time he was questioned intermittently without being apprised of constitutional rights).