Lorraine H. PFEIFER, Plaintiff-Appellant.

v.

WORLD SERVICE LIFE INSURANCE CO.,
a Colorado corporation, Defendant-Respondent.†

Court of Appeals

*No. 83–944. Submitted on briefs April 18, 1984.—
Decided November 21, 1984.*
(Also reported in 360 N.W.2d 65.)

For the plaintiff-appellant the cause was submitted on the briefs of *Russell W. Devitt* and *Soffa & Devitt* of Whitewater.

For the defendant-respondent the cause was submitted on the brief of *Margaret B. Grabowski* and *Brennan, Steil, Ryan, Basting & MacDougall, S.C.* of Janesville.

Before Gartzke, J., Bablitch, J., and Bruce F. Beilfuss, Reserve Judge.

GARTZKE, P.J.   Lorraine Pfeifer, the sole beneficiary of a policy insuring the life of her son, Thomas Pfeifer, appeals from a judgment dismissing her complaint against World Service Life Insurance Company. The issue is whether the trial court erred when finding that Thomas knew that his actions might result in his death. We conclude that the court erred and therefore reverse.

Lorraine Pfeifer commenced this action to recover the accidental death benefits payable under the policy. The case was tried to the court. The only evidence before the court was the deposition of Roslynne Pfeifer, Thomas's ex-wife. Roslynne deposed that Ricky Parise, her son by

a prior marriage, shot Thomas to stop him from beating her.

The policy provides coverage in case of injury, including the death of the insured. Injury is defined as "accidental bodily injury from which loss results directly and independently of all other causes . . . ." The parties agree that Wyoming law controls. They also agree that the Wyoming Supreme Court held in *Rodolph v. New York Life Insurance Company*, 412 P.2d 610, 612 (Wyo. 1966), that a death does not result from accidental bodily injury if the insured knew and expected that his actions might result in his own death.

The trial court made formal findings, including a finding that Thomas knew and expected that his actions against Roslynne might well result in his own death. The court concluded that the death of Thomas did not result from "accidental bodily injury" as defined in the policy.

We are satisfied that the trial court applied the proper test under Wyoming law: whether Thomas knew or expected that his actions might result in his own death, not what a reasonable person in his position would believe. Before examining the support for the court's finding, we state the standards governing our review.

The state of Thomas's mind just before the shooting is disputed. The state of a person's mind must be inferred from the acts and statements of the person, in view of the surrounding circumstances. *See e.g. Muller v. State*, 94 Wis. 2d 450, 473, 289 N.W.2d 570, 582 (1980) (intention must be inferred from defendant's statements and actions); *State v. Wolter*, 85 Wis. 2d 353, 371, 270 N.W.2d 230, 239 (Ct. App. 1978) (state of mind is inferrable from actions and circumstances). The acts and statements of Thomas and the circumstances just prior to the shooting are undisputed because the supporting evidence consists solely of the uncontroverted deposition of Roslynne Pfeifer. Consequently, we are reviewing an

inference drawn by the trial court from undisputed facts.

The standards applicable to appellate review in this state of factual inferences from established or undisputed facts are settled.

We note, however, that the standards for federal appellate review of a trial court's inferences from undisputed facts are unsettled. "Three different tests seem to be current, and decisions from every circuit can be found to support each." Editors, *Federal Civil Appellate Jurisdiction: An Interlocutory Restatement,* 47 Law & Contemp. Probs. 13, 57 (Spring 1984). The authors state that the United States Supreme Court "seemingly favors" the view that the clearly erroneous standard provided in Fed. R. Civ. P. 52(a) is applicable, whether the trial court's findings are based on oral or documentary evidence or are inferences from undisputed facts, citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 394 (1948). The authors consider this to be "the best view." *Id.*

■

Like the federal appellate courts, we apply the clearly erroneous standard when reviewing findings of fact by a trial court. Section 805.17(2), Stats., provides that findings of fact by a trial court sitting without a jury or with an advisory jury "shall not be set aside unless clearly erroneous . . . ." The supreme court adopted the "clearly erroneous" test in 1975, Wisconsin Rules of Civil Procedure, 67 Wis. 2d at 712–13 (1975), but has continued to apply a reasonableness standard to inferences by the trial court. *See, e.g., Vocation., Tech. & Adult Ed. Dist. 13 v. ILHR Dept.,* 76 Wis. 2d 230, 240, 251 N.W.2d 41, 46 (1977). We will continue to apply the reasonableness standard of review to inferences by a trial court from undisputed or established facts, unless the supreme court directs us to use another standard.

■

Whether an inference may reasonably be drawn from undisputed or established facts is a question of law.

*State v. Ziegenhagen,* 73 Wis. 2d 656, 669, 245 N.W.2d 656, 662 (1976); *Mars, Inc. v. Chubrilo,* 216 Wis. 313, 318, 257 N.W. 157, 159 (1934). Deciding the reasonableness of an inference is therefore a recognized appellate function.

An appellate court must accept a reasonable inference drawn by a trial court from established facts if more than one reasonable inference may be drawn. *C.R. v. American Standard Ins. Co.,* 113 Wis. 2d 12, 15, 334 N.W.2d 121, 123 (Ct. App. 1983). If only one reasonable inference is available, the drawing of that inference is a question of law. *Vocation. Tech. & Adult Dist. 13 v. ILHR Dept.,* 76 Wis. 2d at 240, 251 N.W.2d at 46.[1]

This analysis is consistent with the constitutional limitations of the court of appeals. According to *Wurtz v. Fleischman,* 97 Wis. 2d 100, 107 n. 3, 293 N.W.2d 155, 159 (1980), the appellate jurisdiction conferred upon the court of appeals by art. VII, sec. 5(3), of the Wisconsin Constitution precludes us "from making any factual determinations where the evidence is in dispute." Because Roslynne's deposition is uncontroverted, the evidence is undisputed.

We summarize Roslynne's deposition as follows: she and Thomas were married from April 1974 until October 1979. He was six feet tall and weighed about 200 pounds. She is five feet tall and weighs about 80 pounds. Thomas sometimes physically abused her. At least twice Thomas threatened to kill her and once threatened to kill her son, Ricky, who was fourteen years old and under five feet tall the day he shot Thomas. Roslynne believes that Ricky heard Thomas threaten to kill her and Ricky. On three or four occasions Ricky saw Thomas beat his mother. On one occasion she suffered a concussion which required medical treatment. That beating resulted in

[1] *See also State ex rel. Sieloff v. Golz,* 80 Wis. 2d 225, 241, 258 N.W.2d 700, 705 (1977) (when evidence is documentary, reviewing court is not bound by inferences drawn by fact finder).

their divorce, but in late November 1979 Thomas and Roslynne resumed cohabitation until his death.

February 1, 1980, Ricky killed Thomas with a shotgun in Rock Springs, Wyoming. That day Ricky had returned from a hospital following an appendectomy. That evening Thomas and Roslynne had an argument, during which Roslynne told him to leave. She, her father and Ricky went out for dinner. When they returned to her apartment, Thomas's things were gone, her furniture was overturned and broken, and her jewelry and clothing were strewn about.

Roslynne called the police to the apartment. She told them in Ricky's presence that Thomas would be back, that she feared him and that she wanted protection. Before going to bed, and in Ricky's presence, Roslynne's father barricaded the door with a chair. Roslynne leaned the shotgun against the wall by a gunrack at the bottom of the stairway. The gun was unloaded, but ammunition was in the gun rack. The gun had been broken in a fight between Thomas and a friend but Thomas had fired it a few days earlier. Ricky knew how to fire a shotgun. He had fired a shotgun in Thomas's presence.

Sometime after going to bed, Roslynne heard a truck drive up, the apartment door fly open, and Ricky say, "Mom, Tom is here." She told Ricky to stay upstairs, went downstairs, and told Thomas, who was intoxicated and stumbling, to leave. He hit her across the face. She again asked him to leave. He called her names, picked her up and threw her on the couch, picked her up again and threw her against the television set. They fought about five minutes before Roslynne saw Ricky in the room.

Ricky said to Thomas, "Do you love my mother?" Thomas replied, "Yes, I do. I love her very much." Ricky asked, "Then why do you hit her all the time and beat her up?" Thomas and Roslynne told him to go upstairs.

Ricky went to the stairway where the shotgun was leaning. As he started up the stairs, he said, "Don't hit her again, Tom. I can't handle it. Just don't hit her." Thomas and Roslynne again told him to go upstairs. Thomas again hit Roslynne. At this point Ricky was holding the shotgun. Roslynne told him to put it down and go upstairs.

Thomas said, "He won't shoot me. He is not man enough to shoot me." Again Thomas hit Roslynne, and Ricky said, "Don't hit her again, Tom. I am warning you, I will shoot you." Thomas replied, "No, you won't shoot. You are not man enough to pull that trigger. You are nothing but a little boy and nobody can hurt me." When Thomas again struck Roslynne, Ricky said, "I warned you not to hit her again. Now don't do it Tom, or I will shoot." Tom replied, "You are nothing but a fucking little boy and you are not man enough to pull that trigger. You can't hurt me. Nobody can hurt me," and hit Roslynne. When she struck at him, Thomas said, "Well, you can't hurt me either," and knocked her unconscious. The next thing Roslynne knew, Thomas was lying on the floor and Ricky was saying, "I shot him," and, "Mother, it wasn't BB's. It was a slug. I didn't mean to kill him."

Roslynne testified that Ricky was generally obedient. She said she did not "really think that he [Thomas] thought Ricky would actually pull the trigger," and that she "didn't think that he [Ricky] would pull it [the trigger]."

We conclude from Thomas's actions and words just before his death, from Roslynne's belief as to what Thomas thought Ricky would do, and from the surrounding circumstances, that it is unreasonable to infer that Thomas knew and expected that his actions might result in his death. Roslynne had known Thomas for years. Her beliefs as to what Thomas thought just before the

shooting and as to what Ricky would do cannot be ignored.

The only reasonable inference from the undisputed facts is that Thomas did not know or expect that his actions against Roslynne might result in his death. We therefore reverse the judgment of the trial court.

*By the Court.*—Judgment reversed.