IN the INTEREST OF SHAWN B.N., a Person under the Age of 18 years:

SHAWN B.N., Appellant,

v.

STATE of Wisconsin, Respondent.

Court of Appeals

No. 91-1355. Submitted on briefs March 26, 1992.—Decided December 17, 1992.

(Also reported in — N.W.2d —.)

For the appellant the cause was submitted on the brief of *Richard W. Boelter* of Wautoma.

For the respondent the cause was submitted on the brief of *James E. Doyle,* attorney general, with *Gregory M. Posner-Weber,* assistant attorney general.

Before Gartzke, P.J., Dykman and Sundby, JJ.

GARTZKE, P.J. Shawn B.N., born January 22, 1977, appeals from an order adjudicating him delinquent on two petitions joined for purposes of the fact-finding and dispositional hearings. The first petition alleges first-degree intentional homicide. The second alleges attempted first-degree intentional homicide, operating a motor vehicle without the owner's consent, and criminal damage to property, secs. 940.01(1), 939.32, 943.23(2) and 943.01(1), Stats. (1989). He also appeals from an order denying his motion for postconviction relief.

Shawn asserts that (1) the second petition was not timely filed; (2) the plea hearings on the petitions were not timely held; (3) the two petitions should have been tried separately; (4) the court should have suppressed his confession; (5) the court should have excluded a letter he wrote; (6) the court should have instructed the jury on second-degree intentional homicide, imperfect self-defense; (7) the members of the victim's family were improperly admitted to the courtroom; (8) the evidence does not support a conviction for attempted first-degree intentional homicide; and (9) the dispositional hearing was not timely held.

We agree the second petition was not timely filed and should have been dismissed. Because the second petition alleged the attempted homicide charge, we do not reach the eighth issue, the sufficiency of the evidence to support the verdict on that charge. We reject Shawn's other contentions, and we therefore affirm in part and reverse in part.

### 1. Second Petition Filed Too Late

Shawn asserts that on June 5, 1990, when the first petition was filed, the district attorney possessed all the information alleged in the second petition. Because more than twenty days passed between June 5 and July 11, 1990, when the second petition was filed, Shawn asserts that the juvenile court lost competency to proceed on the second petition. The juvenile court generally loses competency to exercise its jurisdiction when ch. 48's pre-dispositional time limits are not met. *In re B.J.N.*, 162 Wis. 2d 635, 654 n.15, 469 N.W.2d 845, 852 n.15 (1991). We agree that because it was untimely filed, the second petition should have been dismissed.

The procedure for filing a delinquency petition begins when the intake worker receives referral information. The intake worker receives the information, conducts an inquiry and recommends whether a petition should be filed. Section 48.067(6), Stats. The intake worker "shall conduct an intake inquiry on behalf of the court to determine whether the available facts establish prima facie jurisdiction and to determine the best interests of the child and of the public with regard to any action to be taken." Section 48.24(1), Stats.

The intake worker must recommend that a petition be filed or close the case within forty days of receipt of referral information. Section 48.24(5), Stats. The district attorney must file the delinquency petition within twenty days after the date that the intake worker's recommendation is filed. Section 48.25(2)(a), Stats. The juvenile court must "dismiss with prejudice a petition which was not timely filed unless the court finds at the plea hearing that good cause has been shown for failure to meet the time limitations." *Id.*

On June 5, 1990, the district attorney filed the first petition alleging that Shawn was delinquent because he had committed first-degree intentional homicide. The petition alleged that on that day Shawn threatened to kill his mother, attempted to attack her with butcher knives and demanded the keys to the family truck. She gave him the keys after he cut the telephone lines to the house. She went to a neighbor's home where she called the sheriff. DNR Warden Krakow responded to the call and reported to the sheriff's department that he saw the truck and was stopping to investigate. Shawn later told a detective that he saw Krakow pull into the driveway of the home of Shawn's grandfather, that Shawn was standing by a white shed on the property where Krakow could not see him, that he had obtained a .22 rifle from

his grandfather's home to kill his mother, and that he fired three or four shots through the window of the shed at Krakow and hit him at least two times. He said he fired at Krakow because he thought he was the only officer around and that he would then be able to leave the premises to find his mother and kill her. Krakow died as a result of his wounds.

On July 11, 1990, the district attorney filed the second petition. It alleged that on June 5, 1990, Shawn's mother was alone in the house with him. He awoke around 10:45 a.m. He left his room and went into the kitchen where he immediately told his mother she was dead. He repeated the statement. She attempted to call the sheriff's department. Shawn removed wire cutters from a tool box, and when his mother fled the room, he went outside and cut the telephone wires from the home. He did not have her consent to cut the wires. His mother attempted to flee the home when she saw Shawn with two large knives which he had taken from the drawer. Shawn came after his mother and attempted to attack her with the knives. She was able to fend him off briefly with a flashlight she had taken. He asked for the keys to the truck which she owned. She tossed him the keys in an attempt to get rid of him, and he left. She did not give Shawn consent to operate the truck. Shawn also indicated he was going to get a .22 rifle, and that when he got it, she would be dead. He left the area in the vehicle. The next time his mother saw him, he was carrying a .22 rifle. Shawn was apprehended. Shawn told an officer that his intent in shooting DNR Warden Krakow was to get past him to be able to go and shoot his mother. Shawn's actions in taking out the knives and getting the rifle were all with the intent that he would kill his mother. The second petition alleged that Shawn was delinquent for attempted first-degree homicide, operat-

355

ing a motor vehicle without the owner's consent, and criminal damage to property.

The district attorney submitted an affidavit opposing Shawn's postconviction motion. In the affidavit the district attorney stated that on June 5, 1990 the intake worker orally referred to him the first-degree intentional homicide recommendation, and he filed the first petition on that day. He stated he had no other facts beyond those developed in the first petition, and the intake worker made no other referral to him until July 9, 1990. On that day he received a referral which resulted in the second petition he filed on July 11, 1990.

Whether the juvenile court erred turns on an analysis of the facts alleged in the first petition and whatever reasonable inferences may be drawn from those facts. We do not defer to a trial court's inferences from a document. *State ex rel. Sieloff v. Golz*, 80 Wis. 2d 225, 241, 258 N.W.2d 700, 705 (1977). Whether an inference may be reasonably drawn from undisputed facts is a question of law which an appellate court may decide. *Pfeifer v. World Serv. Life Ins. Co.*, 121 Wis. 2d 567, 570-71, 360 N.W.2d 65, 67 (Ct. App. 1984). If only one reasonable inference is possible, an appellate court may draw it. *Id.* at 571, 360 N.W.2d at 67.

Because he relied upon the entire course of Shawn's acts for the attempted homicide charge,[1] the district attorney had no more information of consequence when he drew the second petition than he had on June 5, 1990, when he filed the first petition. The first petition alleged that course of conduct.

---

[1] The second petition alleges a single attempted homicide count. At the instructions conference the district attorney stated that Shawn's whole course of conduct constituted a single attempt.

We have not overlooked a new allegation in the second petition: that when Shawn left his mother after getting the truck keys, he indicated he was going to get a .22 rifle and that when he got it, she would be dead. The new allegation was not essential to the charge of attempted homicide. The first petition alleges that Shawn obtained a .22 rifle from his grandfather's home to kill his mother, and Shawn killed the warden because he thought the warden was the only officer around and he could leave to find and kill his mother.

Because the second petition alleging attempted homicide was filed more than twenty days after the intake worker's recommendation was filed, and the court did not find at the plea hearing that good cause was shown for failure to meet the time limitations, the court should have dismissed the second petition with prejudice. Section 48.25(2)(a), Stats.

We turn to the remaining charges in the second petition: criminal damage and operating a motor vehicle without consent. The first petition alleges that the mother reported she "provided the keys to the truck" after Shawn cut the phone lines into the house. The only reasonable inferences from those allegations are that the wire cutting and operation of the motor vehicle were without the mother's consent. As the district attorney himself argued to the jury, "You cannot get consent, ladies and gentlemen, at the point of a butcher knife."

We conclude that the district attorney had suffi-cient facts on June 5, 1990, to allege criminal damage to property and operating a motor vehicle without the owner's consent. The petition so alleging was not filed within the required twenty days. Section 48.25(2)(a), Stats. The trial court therefore erred when it failed to

357

dismiss the parts of the second petition charging Shawn with the commission of those two crimes.

Accordingly, the balance of this opinion deals only with the issues relating to the first petition.

### 2. Plea Hearings Timely

The plea hearing on a delinquency petition "shall take place on a date which allows reasonable time for the parties to prepare but is . . . within 10 days of the filing of a petition . . . for a child who is being held in secure custody." Section 48.30(1), Stats. On June 5, 1990, when the first petition was filed, Shawn was in secure custody. On June 18, 1990, his plea was entered. He asserts that because more than ten days had elapsed, the court lacked competency to proceed on the first petition. *See In re B.J.N.*, 162 Wis. 2d at 654 n.15, 469 N.W.2d at 852 n.15. We disagree. His request for substitution of judge tolled the running of the statute through June 18, 1990.

Section 48.315(1), Stats., provides in relevant part:

The following time periods shall be excluded in computing time requirements within this chapter:

. . . .

(c) Any period of delay caused by the disqualification of a judge.

When denying Shawn's motion for postconviction relief, the court found that the delay in taking the plea hearing was attributable to the substitution of judge and that the June 18 hearing was timely. The finding regarding the delay is one of fact. We must accept a trial court's finding of fact unless it is clearly erroneous. Section

805.17(2), Stats. The finding that the substitution caused the delay is not clearly erroneous.

The plea hearing was originally set for Wednesday, June 13, 1990. On that day, Shawn filed a request for substitution of judge, and the hearing therefore could not be held. The Honorable Mark J. Farnum was assigned as the new judge on Thursday, June 14. He was in the courtroom that day to take the plea hearing. However, Shawn's counsel moved to adjourn the hearing because he and his parents had learned of the hearing only that morning and had not received the seventy-two hour notice allowed by sec. 48.27(3), Stats.[2] While recognizing the merits of the motion, Judge Farnum observed that the substitution had made the notice necessary. Counsel responded that when she requested substitution on June 13, she had not expected to have a new judge so quickly.

Seventy-two hours from the morning of June 14 would expire the morning of June 17, a Sunday, making June 18 the first day the hearing could be held. Section 990.001(4)(b), Stats. We conclude that the hearing was timely held on June 18.

### 3. Petitions Properly Tried Together

Over Shawn's objection, the court joined the two petitions for the hearing. The court viewed the June 5, 1990, events as a continuous transaction, it being a reasonable hypothesis that Shawn killed the warden so he could kill his mother. The court concluded that the pub-

---

[2] Section 48.27(3), Stats., provides in relevant part:

The court shall also notify, under s. 48.273, the child and any parent . . . of all hearings . . . .. The first notice to any interested party shall be written and have a copy of the petition attached to it. Thereafter, notice of hearings may be given by telephone at least 72 hours before the time of the hearing.

lic interest in judicial economy outweighed Shawn's interest in separate trials, given the single set of facts and no significant possibility of prejudice to him from joinder. The court said it would consider severance if Shawn could show that he would testify with respect to only one petition. The court rejected the proposition that the jury would be confused and prejudice would result to Shawn should the petitions be tried together.

Shawn's claim that the court failed to exercise its discretion has no merit. The court announced a logical rationale on the basis of the record before it and made no error of law. The court even left open the joinder issue subject to Shawn's making a showing regarding his testimony, a showing he never made.

On appeal, the only prejudice Shawn claims is based on the letter he wrote to his grandparents which we discuss in Part 4(c). He argues that the letter could have referred to any one of the four acts with which he was charged killing the warden, attempting to kill his mother, taking the truck without her consent and the wire-cutting incident. For that reason, he argues the letter could not have been admitted at both trials if the petitions were tried separately, and that, alone, in his view, rendered the court's ruling an erroneous exercise of discretion.

We do not review Shawn's argument. He raises a new issue regarding joinder of the petitions for the hearing. He did not raise the issue in the juvenile court. Had he done so, perhaps his contention would have affected the court's views on how the petitions should be heard or affected the way the court conducted the single hearing. We generally will not review an issue raised for the first

time on appeal. *Wirth v. Ehly*, 93 Wis. 2d 433, 443-44, 287 N.W.2d 140, 145-46 (1980).

If, of course, the juvenile court had dismissed the second petition, no joinder issue would have arisen. But our holding that the trial court should have dismissed the second petition does not compel a reversal on grounds of an improper joinder. The evidence regarding the homicide of the warden was overwhelming. We are satisfied that joinder did not prejudice Shawn's hearing on the first petition. Consequently, that error has no effect on our disposition of the joinder issue.

### 4. Fact-Finding Hearing

#### a. Victim's Family Properly Admitted

The court permitted the warden's wife, his children, his parents, his wife's parents, and the person who provided support services to the family to attend the fact-finding hearing Shawn contends the court erred. He relies on sec. 48.299, Stats.[3]

---

[3] Section 48.299(1), Stats., provides in relevant part:

(a) The general public shall be excluded from hearings under this chapter . . . unless a public fact-finding hearing is demanded by a child through his or her counsel . . .. If a public hearing is not held, only the parties, their counsel, witnesses and other persons requested by a party and approved by the court may be present. Any other person the court finds to have a proper interest in the case or in the work of the court, including a member of the bar, may be admitted by the court.

(am) Subject to s. 906.15, if a public hearing is not held, in addition to persons permitted to attend under par. (a), victims of a child's alleged act shall have the right to attend a hearing under s. 48.31 [fact-finding hearing] . . ., except that a judge may exclude victims from any portion of the hearing which deals with sensitive personal matters of the child or the child's family and which do not directly relate to the alleged act committed against the victim. A member of

The court did not err. Although sec. 48.299(1)(am), Stats., could be clearer, we think the intent is to allow the court, when the alleged delinquent child is accused of having committed a homicide, to permit close relatives of the decedent to attend the fact-finding hearing. Those persons are truly victims of the child's alleged homicide. While the last sentence of sub. (1)(am) provides that "[a] member of the victim's family" may attend, it applies when the victim is living. Subsection (1)(am) specifically permits representatives of an organization providing support services to the victim—in this case members of the family—to attend the hearing.

Shawn's contention that the court erroneously exercised its discretion is meritless. The victims of a child's act have a statutory right to attend the fact-finding hearing. Section 48.299(1)(am), Stats. The court's discretion is limited to determining whether to exclude victims from parts of the hearing dealing with the sensitive matters described in the statute.

We reject Shawn's claim that the ruling prejudiced him. He claims the warden's wife laughed during counsel's opening statement. The accuracy of the claim is in doubt. Shawn's investigator stated that the warden's wife laughed after the state's first witness was called. Whatever the fact, counsel's failure to complain until the third day of the trial indicates that she viewed it as unimportant. *Odell v. State*, 90 Wis. 2d 149, 155, 279 N.W.2d 706, 709 (1979) (per curiam). So far as this

the victim's family and, at the request of the victim, a representative of an organization providing support services to the victim, may attend the hearing under this subsection.

record discloses, the court otherwise succeeded in preventing improper behavior.

We conclude that the court did not err when it permitted the specified members of the warden's family to attend the fact-finding hearing under sec. 48.299(1)(am), Stats.

### b. Suppression Motion Properly Denied

The trial court denied Shawn's motion for an order suppressing his inculpatory statements to the law enforcement officers. Shawn contends that he did not knowingly, intelligently and voluntarily waive his fifth amendment rights. We reject his contentions.

The state must prove that an accused knowingly, intelligently and voluntarily waived his rights. *State v. Woods*, 117 Wis. 2d 701, 722, 345 N.W.2d 457, 468 (1984). When determining whether the state met its burden, the courts apply a totality of the circumstances analysis. *Id.* That analysis applies even if the individual is a juvenile. *Id.* The circumstances include the juvenile's age, experience, education, background, intelligence and capacity to understand the warnings given, the nature of his fifth amendment rights and the consequences of waiving those rights. *Id.* We independently examine the facts presented by the state to determine whether as a matter of constitutional law the accused knowingly, intelligently and voluntarily waived his rights. *Id.* at 721-22, 345 N.W.2d at 468.

The juvenile court heard evidence produced by the state that on June 5, 1990, at about 11:00 a.m. officers saw Shawn running with a gun near his grandfather's house. He dropped the gun. The officers pursued him for about twenty yards. When Shawn stopped, one officer ordered him to lay face down on the ground. Shawn

complied and was handcuffed. An officer asked him what happened. Shawn replied that he had shot and killed a cop. The officers put him in the back seat of a squad car.

Chief Deputy Sheriff Malsack interviewed Shawn in the back of the squad car at about 11:25 a.m. Malsack was in plain clothes and wore no weapon. He removed Shawn's handcuffs, read him his *Miranda* rights and asked him if he understood. Shawn replied that he did. When the waiver provisions were read to him, Shawn did not reply but he signed the *Miranda* card.

Deputy Malsack testified that as soon as he opened the squad car door, Shawn began talking about the incident. When Malsack opened the door Shawn said, "I didn't want to kill him." Malsack had to ask him to stop talking, be quiet and listen. At one point Shawn asked whether he would ever be able to see his mother again. Malsack responded that Shawn would see her but not at the moment. Shawn did not ask to see his father or an attorney.

Deputy Malsack testified that Shawn cried during the interview and was nervous, frightened, but lucid and cognizant. He seemed to understand everything Malsack said to him. Shawn responded to questions in a meaningful manner and did not appear overly frightened, considering the circumstances. He was cooperative, and eager to talk but Malsack had the impression that he did not fully understand what had happened. Malsack made no promises or threats to him. The principal of Shawn's school furnished his report card for the 1989-90 school year and his 1989 scholastic aptitude test results.

 Following the hearing and after considering the totality of the circumstances, the court found on the basis of the S.A.T. test results that Shawn's intelligence is such that he performs at the level of the average adult.

He was properly given his *Miranda* warnings and he understood them. We conclude that his statements to the officers were voluntary and products of his free and unrestrained will.

That Shawn was thirteen years old does not prevent his statement from being voluntary, absent coercion. Whether or not he was emotionally disturbed (as he claims), Shawn responded meaningfully during the interview. In *Vance v. Bordenkircher,* 692 F.2d 978, 980-81 (4th Cir. 1982), *cert. denied,* 464 U.S. 833 (1983), the court found that a fifteen-year-old boy with an I.Q. of 62 with the mental age of nine had voluntarily confessed to the murder of a homeowner and his housekeeper. The court concluded on the basis of a review of the cases that physical age and mental capacity, alone, do not require a finding as a matter of law that a confession was involuntary. In that case the child had been advised of his rights, his access to outside adults was not restricted, the initial confession did not come at the end of an extended interrogation, and no evidence of coercion existed. While Shawn had asked whether he would ever be able to see his mother again, he did not ask to see her immediately. Thus, he was not denied access to his mother or any other adult when he was questioned.[4]

We are satisfied from our independent review of the totality of the circumstances that we must affirm the court's findings that he was properly given his *Miranda* warnings and Shawn understood them, and that his

---

[4] Shawn asserts that we should take into account not only his age and emotional state but also that he was told by an officer that he had just killed another officer. The juvenile court had no evidence before it that an officer told Shawn he had killed another officer. On the contrary, it was Shawn who told one of the officers who initially stopped him that he had killed another officer.

statements to the officers were voluntary and the products of his free and unrestrained will.

We affirm the juvenile court's order denying Shawn's motion to suppress his inculpatory statements.

### c. Letter Properly Admitted

The state offered in evidence a letter Shawn had written to his grandparents on July 6, 1990 while in detention. The pertinent parts of it are as follows:

> I admit I did some stupid stuff in my life but this was to stupid. I bet I know what your saying, "Why, why did he do it"! I did it because I was mad and angry but I am very sorry for do in it. . . .. I know what I feel, at night I'm scared, (I sleep under my bed) I'm sorry for doing it, and I'm lonly! (Grammatical errors in original.)

Shawn objected on grounds that the letter was irrelevant, does not refer to a particular act, and its low probative value was outweighed by its prejudicial effect. The court admitted the letter. The court reasoned that what Shawn referred to in the letter can be inferred from the circumstances under which it was written and its contents to be the June 5 incident.

Shawn contends that the letter was irrelevant because it was written a month after the June 5 incident, he could be sorry for a host of acts between that date and the date of the letter, what it refers to requires speculation, and the court did not decide whether the probative value of the letter was outweighed by the danger of unfair prejudice. We conclude the court did not err.

Evidentiary rulings are discretionary. *State v. Lindh,* 161 Wis. 2d 324, 348, 468 N.W.2d 168, 176 (1991). A relevancy ruling, in particular, is a discretion-

ary determination. *State v. Pharr,* 115 Wis. 2d 334, 345, 340 N.W.2d 498, 503–03 (1983). We must affirm a discretionary ruling if it is supported by a logical rationale, is based on facts of record and involves no error of law. *Loy v. Bunderson,* 107 Wis. 2d 400, 414-15, 320 N.W.2d 175, 184 (1982).

Relevant evidence tends to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Section 904.01, Stats. One fact of consequence was whether Shawn shot the warden. The court properly exercised its discretion when it concluded, in effect, that the jury could reasonably infer that the letter tended to make that fact more probable.

The probative value of relevant evidence may be substantially outweighed by the danger of unfair prejudice. Section 904.03, Stats. Because the court knew from Shawn's objection that he claimed unfair prejudice, the court implicitly held that the probative value of the letter was not substantially outweighed by unfair prejudice. *Pharr,* 115 Wis. 2d at 347, 340 N.W.2d at 504. Since the court exercised its discretion, we decide whether the record supports its ruling. *Id.* at 348, 340 N.W.2d at 504. It does. Given the reasonable inference that in his letter Shawn expressed his regret over having shot the warden, the court could conclude that the probative value of the letter far outweighs the risk of unfair prejudice.

### d. Instruction on Mitigation of First-Degree Intentional Homicide Properly Denied

The court denied Shawn's request that the jury be instructed on the basis of Wis J I—Criminal 1014. That

instruction is designed for a case in which first-degree intentional homicide, sec. 940.01, Stats., is charged, there is evidence that the defendant acted in self-defense, and the lesser-included offense of second-degree intentional homicide is to be submitted to the jury. Wis J I—Criminal 1014, Comment, Note 1. The court refused to give the instruction because Shawn was at all times the aggressor. We agree that Shawn was not entitled to the instruction.

Section 940.01, Stats., provides in relevant part:

(1) Except as provided in sub. (2), whoever causes the death of another human being with intent to kill that person or another is guilty of a Class A felony.

(2) The following are affirmative defenses to prosecution under this section which mitigate the offense to 2nd-degree intentional homicide under s.940.05:

. . ..

(b) Death was caused because the actor believed he or she or another was in imminent danger of death or great bodily harm and that the force used was necessary to defend the endangered person, if either belief was unreasonable.

. . ..

(3) When the existence of an affirmative defense under sub. (2) has been placed in issue by the trial evidence, the state must prove beyond a reasonable doubt that the facts constituting the defense did not exist in order to sustain a finding of guilt under sub. (1).

Section 940.05, Stats., provides in relevant part:

(1) Whoever causes the death of another human being with intent to kill that person or another is guilty of a Class B felony if:

(a) In prosecutions under s. 940.01, the state fails to prove beyond a reasonable doubt that the mitigating circumstances specified in s. 940.01(2) did not exist as required by s. 940.01(3) . . ..

The phrase "placed in issue by the trial evidence" in sec. 940.01(3), Stats., is critical to our analysis. It establishes the scope of appellate review when the claim is made, as here, that the accused person is entitled to a mitigational affirmative defense under sec. 940.01(2), Stats. The phrase is

> intended to codify the existing Wisconsin standards relating to submitting mitigating circumstances or other "defenses" to the jury. The simplest statement of the standard is that there must be "some evidence" of the matter before the mitigating circumstance must be submitted to the jury. A more complete statement is found in *State v. Felton* [110 Wis. 2d 485, 508, 329 N.W.2d 161, 171 (1983)]: "[I]f it appears from the evidence, either that produced by the state or by the defense, that a jury, *under a reasonable view of the evidence,* could conclude that the state has not sustained its burden of disproving [the mitigating circumstances]."

Dickey, Schultz and Fullin, *The Importance of Clarity in the Law of Homicide: The Wisconsin Revision,* 1989 WIS. L. REV. 1323, 1346 (footnotes omitted; emphasis added). According to the same authors, the " 'some evidence' standard is a relatively low threshold, in part because of the distinct functions of the judge and jury . . .. It is better to let the jury make these decisions whenever the issue is fairly presented." *Id.* at 1347.

We do not, however, understand the authors to hold that the "reasonable view of the evidence" test set forth by the *Felton* court always must be answered by the jury.

369

The test is objective. The court must apply it before deciding whether a mitigational affirmative defense allowed under sec. 940.01(2), Stats., should be submitted to the jury. And it is a test which an appellate court applies *de novo. State v. Kramar,* 149 Wis. 2d 767, 791, 440 N.W.2d 317, 327 (1989).

The jury, under a reasonable view of the evidence, could not have found that when he shot the warden, Shawn, in the language of sec. 940.01(2)(b), Stats., "believed he . . . was in imminent danger of death or great bodily harm and that the force used was necessary to defend [himself]."

Shawn asserts in his brief that the situation before him involved an unmarked vehicle driving into his grandfather's driveway at a high speed, without a siren, without lights or markings identifying it as a law enforcement vehicle. He asserts in his brief on appeal that he thought the officer was going for a weapon. He relies on counsel's cross-examination of Deputy Malsack. On cross-examination Deputy Malsack agreed that the warden's vehicle was not marked as a law enforcement vehicle and its red light was not working. Malsack testified that Shawn said he aimed for the officer's arm and thought the officer was going for his weapon because he saw him reach down.

However, Shawn's mother testified that he told her he was going to get the .22 and when he did she was dead. When he saw the warden's car, he could see the warden but the warden could not see him. He knew that the warden was a law enforcement officer because he saw the warden's badge. He fired his rifle two or three times at the warden from a very short range, perhaps some six feet. Then, as he told Deputy Malsack, he shot the warden because he wanted to get past the warden so that he could shoot his mother.

Applying the objective test, we conclude that a reasonable jury could not find that at the time he shot the warden, Shawn believed he was in imminent danger of death or great bodily harm and that the force he used was necessary to defend himself.

We conclude that the trial court did not err when it refused to give Wis J I—Criminal 1014.

### 5. Dispositional Hearing

#### a. Hearing Timely Held

Section 48.31(7), Stats., provides in pertinent part:

> At the close of the fact-finding hearing, the court shall set a date for the dispositional hearing which allows a reasonable time for the parties to prepare but is no more than 10 days from the fact-finding hearing for a child in secure custody . . ..

Shawn's fact-finding hearing ended on September 28, 1990. He remained in secure custody. At the end of the hearing the court could hold the dispositional hearing at any time. Counsel for Shawn immediately stated, "Your Honor, we'll waive the time limits with respect to the disposition. We'll be requesting a psychological evaluation. And I would ask the court to allow me ten days to provide to the court the name of the examiner."

The parties tentatively agreed to October 29, 1990, for the dispositional hearing. On October 22, 1990, the court ordered the requested psychological evaluation of Shawn pursuant to sec. 48.295(1), Stats. Two psychologists eventually evaluated Shawn, and their opinions were presented at the dispositional hearing held on November 13, 1990.

▮▮ When rejecting Shawn's claim that the dispositional hearing was not held timely, the court held that his request for a psychological evaluation tolled the time limits. We agree. Section 48.315(1), Stats., provides in relevant part:

> The following time periods shall be excluded in computing time requirements within this chapter:
>
> (a) Any period of delay resulting from other legal actions concerning the child, including an examination under s. 48.295 or a hearing related to the child's mental condition, prehearing motions, waiver motions and hearings on other matters.

▮▮▮▮▮ Shawn suggests that the court erred because it ordered the psychological evaluation without questioning its necessity, and failed fully to comply with sec. 48.295, Stats.[5] We decline to review those contentions. Shawn's trial counsel requested the evaluation and did not object to the order until after the dispositional hearing. If error occurred, Shawn's counsel invited it. We will not review invited error. *Cf. Zindell v. Central Mut. Ins. Co.*, 222 Wis. 575, 582, 269 N.W. 327, 330 (1936) (appellant cannot complain of error induced by appellant).

---

[5] Section 48.295(1), Stats., provides in relevant part:

After the filing of a petition and upon a finding by the court that reasonable cause exists to warrant an examination[,]. . . the court may order any child coming within its jurisdiction to be examined . . . by a physician, psychiatrist or licensed psychologist, or by another expert appointed by the court. . . .. The court shall hear any objections by the child, the child's parents, guardian or legal custodian to the request for such an examination or assessment before ordering the examination or assessment.

### b. Members of Family Improperly Admitted

The court allowed the members of the warden's family to attend the dispositional hearing. The court erred.

Section 48.299(1)(a), Stats., became effective in 1980.[6] It applies to "hearings under this chapter" and allows attendance of persons falling within the broad class of those "approved by the court." Subsection (1)(am), on the other hand, became effective in 1987.[7] It specifically applies to "a hearing under s. 48.31," a fact-finding hearing, and it allows attendance of specific persons: victims of a child's alleged act, a member of the victim's family and a representative of an organization providing support services to the victim. Given the general rule that the specific statutes control over general statutes, *Gottsacker Real Estate Co. v. State,* 121 Wis. 2d 264, 269, 359 N.W.2d 164, 167 (Ct. App. 1984), we conclude that sub. (1)(am) allows victims of a child's alleged act to attend only the fact-finding hearing and not the dispositional hearing.

Our construction of sec. 48.299(1)(am), Stats., is consistent with the authorization to the juvenile judge to "exclude victims from any portion of the hearing which deals with sensitive personal matters of the child or the child's family and which do not directly relate to the alleged act committed against the victim." The fact-finding hearing deals with whether the allegations of the delinquency petition are supported beyond a reasonable doubt. Section 48.31(1), Stats. Thus, the fact-finding

---

[6] Section 44, ch. 300, Laws of 1979, created what is now sec. 48.299(1)(a), Stats. The statute was renumbered by sec. 6, 1985 Wis. Act 311.

[7] Section 880L, 1987 Wis. Act 27.

hearing will generally not include sensitive personal matters of the child or the child's family which do not directly relate to the "act," and the juvenile judge may exclude victims from any portion of the hearing which does deal with such material.

However, the dispositional hearing is likely to cover sensitive personal matters of the child or the child's family which do not directly relate to the alleged act committed by the child. The disposition must "employ those means necessary to maintain and protect the child's well-being which are the least restrictive of the rights of the parent or child and which assure the care, treatment or rehabilitation of the child and the family, consistent with the protection of the public." Section 48.355(1), Stats. Grounds therefore exist to exclude the victim and members of the victim's family from the dispositional hearing rather than leaving it to the court's discretion.

The court's error does not require dismissal of the petition to adjudicate Shawn delinquent on the basis of homicide, sec. 940.01(1), Stats. The error had no effect on the fact-finding hearing. That hearing was concluded before the dispositional hearing was held.

The error did not affect the court's subject-matter jurisdiction to conduct the dispositional hearing. The circuit courts possess plenary subject-matter jurisdiction by virtue of the Wisconsin Constitution. *In re Eberhardy*, 102 Wis. 2d 539, 551, 307 N.W.2d 881, 886 (1981).

A court may lose its competency to exercise subject-matter jurisdiction. This occurs when a juvenile court fails to act within mandatory time limits. *See, e.g., In re R.H.*, 147 Wis. 2d 22, 25, 433 N.W.2d 16, 18 (Ct. App.

1988), *aff'd,* 150 Wis. 2d 432, 441 N.W.2d 233 (1989) (per curiam); *In re B.J.N.,* 162 Wis. 2d 635, 654 n.15, 469 N.W.2d 845, 852 n.15 (Ct. App. 1991); *In re L.M.C.,* 146 Wis. 2d 377, 391, 432 N.W.2d 588, 594 (Ct. App. 1988). We have already decided that the dispositional hearing was timely held.

Failure to close the dispositional hearing did not affect the court's competency to hold the hearing itself. The error resulted in the presence of persons who should not have been there. It did not affect the merits. The error was procedural.

A procedural error does not require reversal or a new trial unless it affected the substantial rights of a party. Section 805.18(1), Stats. Shawn makes no claim that the error affected his constitutional rights. Nor has he shown that the error affected whatever rights he may have under sec. 48.299(1), Stats.

We are struck, moreover, with the futility of a second dispositional hearing. It would accomplish nothing. The state's witnesses recommended at the first hearing that Shawn should be placed in secure custody at Lincoln Hills. Shawn's counsel and apparently his parents agreed with that recommendation. The dispositional order follows the recommendation. It transfers his custody to the department until he is twenty-five years of age. Since Shawn was adjudged delinquent for having violated sec. 940.01(1), Stats., first-degree intentional homicide, the order transferring his legal custody must remain in effect until he reaches twenty-five, unless the order is earlier terminated. Section 48.366(1)(a), Stats. It appears certain that the same order with respect to his custody and age of release will be entered if a second

dispositional hearing is held. A second hearing would be useless.

We decline to order a second dispositional hearing. On remand, the trial court shall dismiss the second petition and vacate the order adjudicating Shawn a delinquent on the basis of the verdict finding that he committed the acts alleged in the second petition. The orders before us are otherwise affirmed.

*By the Court.*—Orders affirmed in part and reversed in part; cause remanded for further proceedings consistent with this opinion.