COURT OF APPEALS
DECISION
DATED AND FILED

May 9, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1036-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF5434

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JUAN ANDRES BALDERAS, JR.,

DEFENDANT-APPELLANT.


APPEAL from a judgment and an order of the circuit court for Milwaukee County: MICHELLE ACKERMAN HAVAS, Judge. *Affirmed*.

Before Brash, C.J., Donald, P.J., and Dugan, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Juan Andres Balderas, Jr., appeals a judgment of conviction entered following a jury trial for one count of first-degree recklessly endangering safety, and one count of second-degree recklessly endangering safety, both with the use of a dangerous weapon. He also appeals the denial of his postconviction motion.[1] On appeal, Balderas contends that: (1) the discovery of a new witness entitles him to a new trial; (2) the circuit court erred when it failed to provide a castle doctrine jury instruction; and (3) his trial was unconstitutional. Upon review, we reject Balderas's arguments and affirm.

## BACKGROUND

¶2 Balderas was charged with one count of first-degree recklessly endangering safety and one count of second-degree recklessly endangering safety, both with the use of a dangerous weapon. According to the criminal complaint, Balderas shot his brother, E.B., in the neck. As E.B. ran away, additional shots were fired.

¶3 Relevant to this appeal, at trial, E.B. testified that Balderas was his older brother, and that prior to the shooting there was a family argument on social media. On November 12, 2018, E.B. decided to go to Balderas's house to talk to him.

---

[1] We note that Balderas's notice of appeal also seeks to appeal an order denying a motion for release on bond pending appeal, and an order denying a motion to reconsider this request. Balderas, however, does not develop an argument or cite any legal authority related to the denial for release on bond pending appeal. We do not address undeveloped and conclusory arguments. *See* *State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). Therefore, we do not discuss this request further.

¶4      E.B. parked across the street from Balderas's house, and saw Balderas outside in his yard. E.B. and Balderas made eye contact, and then Balderas began walking to his van. E.B. then got out of his car. As E.B. approached the van, Balderas was sitting in the driver's seat. E.B. made eye contact with Balderas and "kind of said hey." Balderas produced a gun and shot E.B. in the neck. E.B. said, "what the hell, you shoot your own brother." Balderas responded, "hell yeah," raised his gun, and started firing again. E.B. ran away and told some road workers to call the police. According to E.B., he did not crouch or tiptoe to the van, he did not have anything covering his face, his sweatshirt hood was not up, and he was not armed with a weapon.

¶5      In support of E.B.'s testimony, the State introduced a photo showing the bullet wound to E.B.'s neck. The State also introduced a photo of E.B.'s sweatshirt showing a bullet hole at the top of the hood. Based on the location of the bullet hole at the top of the hood, the State argued that if E.B.'s hood had in fact been up, the bullet wound would have been on E.B.'s head, not his neck. Thus, the State contended that Balderas was not telling the truth about E.B. having his hood up.

¶6      Balderas testified that on the day of the shooting, he went outside to his van to go to work. As he left the house, he did not see anyone. Once Balderas was in his van, he saw someone in his side mirror "with their hoody on creeping up" on the side of his van. Balderas testified that when he saw a person approaching his van, he felt scared for his life. Balderas testified that the person opened the door and swung at him. In response, Balderas grabbed his gun and fired a warning shot. After firing a warning shot, Balderas recognized E.B. Balderas testified that E.B. said that "I can't believe I'm shot" and then started running.

3

¶7 According to Balderas, E.B. stopped by some garbage cans and bent down, and it looked like he was raising something in his hand. Balderas then discharged his weapon two more times into his neighbor's lawn saying, "I'm not fucking playing." Later, Balderas testified that "now that I think about it, maybe he was putting a gun down" so the police would not find it. Balderas continued that "[n]ow, that I'm thinking about it, why would he go over there and bend down? He's either putting the gun down or picking the gun up." Balderas admitted, however, that he never mentioned his suspicions to the police. When asked to explain how E.B.'s hood could have been up, given that the bullet hole was in the top of the hood and E.B. was not shot in the head, Balderas said that "he was crouched down and the bullet was bouncing around in there."

¶8 The circuit court provided a self-defense instruction to the jury on both counts. *See* WIS JI—CRIMINAL 805. Subsequently, during deliberations, the jury inquired as to whether bodily harm has to occur before force can be used in self-defense or whether a person can use force if they merely fear that they will be harmed. Balderas's trial attorney argued that the proper response would be to instruct the jury to read the jury instructions. The circuit court agreed, and instructed the jurors to refer to the jury instructions.

¶9 The jury found Balderas guilty as charged. Postconviction, Balderas moved for a new trial based on newly-discovered evidence, or in the interest of justice. The motion argued that the police failed to take a statement from Amanda Bailey, who asserted in a post-trial affidavit that she witnessed the incident between Balderas and E.B. Balderas also claimed that his due process rights were implicated because police failed to take Bailey's testimony. Balderas did not raise any claims regarding the jury instructions.

¶10 On April 7, 2021, the circuit court held an evidentiary hearing. At the hearing, Bailey testified that she is friends with Balderas's domestic partner, Delvina Harris. Bailey testified that on November 12, 2018, she was in the alley in view of Balderas's residence because she was going to use the garage to work on her car. Bailey saw a man with darker clothing and a hood on walking towards Balderas's van. As the person walked, "their pace picked up." The person then went between Balderas's van and a garage. Bailey testified that the van obscured her view of the man at that point. Bailey heard a pop. A few seconds later, she heard a second pop and a scream. Due to safety concerns, she left the scene. As she left, she saw the man run away.

¶11 After Bailey returned to the scene, an officer told her that "You can't come in here." She responded, "Why can't I come in here? I was here when it happened." Bailey then left the scene because the police were not listening to her. After Bailey spoke to Harris, she returned to the scene a second time. Bailey again tried to give her eyewitness account to the same officer, who refused her again.

¶12 Detective Anna Ojdana testified that she reviewed her body camera footage and Bailey only approached her at the scene on a single occasion and did not try to give her information about the shooting. Detective Ojdana testified that Bailey approached her and said, "I lived around the corner I seen the cops here, I'm here to check on my friend." Detective Ojdana responded that Bailey's friend was not involved and the shooting did not take place in the house. The State moved into evidence Detective Ojdana's body camera footage and footage from a squad car.

5

¶13    On April 26, 2021, after hearing argument from both parties, the circuit court issued an oral ruling concluding that Bailey's testimony did not justify a new trial because it was merely cumulative, not material, and most likely would not change the result.

¶14    Balderas moved for reconsideration to present further testimony from another individual, Delvina Harris, who would corroborate that Bailey was present at the scene.  Balderas complained that the hearing limited the testimony to "only" Bailey's testimony, but the State was permitted to call Detective Ojdana.

¶15    The circuit court denied the motion for reconsideration.  The circuit court faulted Balderas for failing to timely object or seek to present Harris's testimony.  In addition, the court noted that Harris was not an eyewitness to the shooting, and could not "offer any useful testimony about what happened."  Even if Harris placed Bailey at the scene of the shooting, the court found that Bailey's testimony about what she actually saw was "not enough … to give rise to a reasonable probability of a different outcome at a new trial[.]"  This appeal follows.  Additional relevant facts are referenced below.

## DISCUSSION

¶16    On appeal, Balderas contends:  (1) the discovery of Bailey, a new witness, entitles him to a new trial as newly-discovered evidence, in the interest of justice, or a **Brady** violation;[2] (2) the circuit court erred when it failed to provide a

---

[2] *See **Brady v. Maryland***, 373 U.S. 83 (1963).

"castle doctrine" jury instruction; and (3) his trial was unconstitutional. We address each of these arguments in turn.[3]

## I.    Bailey's testimony

### A.    Newly-Discovered Evidence

¶17    Balderas first contends that Bailey's testimony constitutes newly-discovered evidence.

¶18    To prevail on a newly-discovered evidence claim, a defendant must show by clear and convincing evidence that:  "(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." *State v. Love*, 2005 WI 116, ¶43, 284 Wis. 2d 111, 700 N.W.2d 62 (citation omitted).  If a defendant satisfies his burden on all four of these elements, the circuit court must then determine "whether a reasonable probability exists that a different result would be reached in a trial." *State v. Avery*, 2013 WI 13, ¶25, 345 Wis. 2d 407, 826 N.W.2d 60 (citation omitted).

¶19    "The decision to grant or deny a motion for a new trial based on newly-discovered evidence is committed to the circuit court's discretion." *Id.*, ¶22.  "A court properly exercises its discretion if it relies on the relevant facts in

---

[3] We note that in his briefs to this court, Balderas references several other claims in passing, including that:  the circuit court improperly prevented Delvina Harris from testifying at the evidentiary hearing; the circuit court failed to apply the proper sentencing factors; and his sentence was excessive.  These arguments, however, are conclusory and undeveloped.  As a result, we decline to address them. *See Pettit*, 171 Wis. 2d at 646.

the record and applies the proper legal standard to reach a reasonable decision." *State v. Edmunds*, 2008 WI App 33, ¶8, 308 Wis. 2d 374, 746 N.W.2d 590.[4]

¶20    Here, Bailey's testimony is not material to an issue in the case. At the evidentiary hearing, Bailey in essence testified that she saw a person with darker clothing and a hood on walking to Balderas's van. Bailey then heard a "pop" followed by a second "pop" and a scream. Bailey then saw the man run away.

¶21    Bailey, however, testified that she did not observe any interaction between E.B. and Balderas because her view was obscured by the van. In addition, given that she was "far away," she could not hear if any discussion took place. As a result, as the State observes, Bailey could not testify to whether E.B. startled Balderas, whether Balderas intended to shoot E.B. or simply fire warning shots, or whether he was aiming at E.B. when he fired the second and third shots. Bailey did not observe any interaction between E.B. and Balderas or witness the actual shooting.[5] Therefore, Bailey's testimony is not material, and we conclude

---

[4] We observe that in some cases the reasonable probability determination of the newly-discovered evidence test is reviewed for an erroneous exercise of discretion. *See State v. Avery*, 2013 WI 13, ¶22, 345 Wis. 2d 407, 826 N.W.2d 60; *State v. Edmunds*, 2008 WI App 33, ¶16, 308 Wis. 2d 374, 746 N.W.2d 590. In contrast, other cases state that this determination is a question of law that we review *de novo*. *See State v. Plude*, 2008 WI 58, ¶33, 310 Wis. 2d 28, 750 N.W.2d 42; *State v. Watkins*, 2021 WI App 37, ¶44, 398 Wis. 2d 558, 961 N.W.2d 884. Because Bailey's testimony is not material, and thus, does not satisfy the criteria for newly-discovered evidence, we do not reach the question of whether a reasonable probability exists that a different result would be reached in a trial and the accompanying standard of review. *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) (stating that "cases should be decided on the narrowest possible ground").

[5] Balderas states that Bailey "thought [E.B.] may have been involved in a carjacking[.]" However, the carjacking theory was suggested by postconviction counsel at the evidentiary hearing. Postconviction counsel asked," Maybe a carjacking?" Bailey responded, "It could have been, yes."

that the circuit court did not erroneously exercise its discretion when it denied Balderas's newly-discovered evidence claim.

¶22　Balderas seems to suggest that the circuit court erroneously denied his newly-discovered evidence claim based on an improper credibility determination at the April 26 hearing. *See Avery*, 345 Wis. 2d 407, ¶25 (stating that "the court is not to base its decision solely on the credibility of the newly discovered evidence, unless it finds the new evidence to be incredible"). The transcript of the evidentiary hearing reflects, however, that the circuit court's comments relating to credibility were in regards to Bailey's claims about attempting to speak to the officers twice and being rebuffed, not in regards to Bailey's testimony about what she saw. Thus, we reject Balderas's claim that the circuit court erroneously denied his newly-discovered evidence due to improper credibility determinations. *See id.*, ¶22.

### B. Interest of Justice

¶23　Balderas also contends that he is entitled to a new trial in the interest of justice based on Bailey's testimony. Balderas states that he "amends" all of his prior references to WIS. STAT. §§ 805.15 (2021-22)[6] and 805.16 to WIS. STAT. § 974.02.

¶24　Balderas, however, fails to sufficiently develop an argument on this point. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). Moreover, Balderas appears to rely on the same facts as his newly-discovered

---

[6] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

evidence claim. As stated above, we reject Balderas's claim that Bailey's testimony constitutes newly-discovered evidence. Thus, we are not persuaded that this provides grounds for a new trial in the interest of justice. Reversals in the interest of justice are only granted in exceptional cases, and we are not convinced this is the type of exceptional case warranting an exercise of our discretionary powers. *State v. Kucharski*, 2015 WI 64, ¶41, 363 Wis. 2d 658, 866 N.W.2d 697.

### C. *Brady* Claim

¶25    In addition, Balderas argues that the failure to turn over Detective Ojdana's body camera, which showed Bailey, constitutes a *Brady* violation. *See Brady v. Maryland*, 373 U.S. 83 (1963).

¶26    To establish a *Brady* violation, a defendant needs to show that: (1) the evidence was favorable to the defense, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence was material. *State v. Wayerski*, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468.

¶27    The State contends that Balderas failed to preserve his *Brady* claim because he did not raise it in his postconviction motion.[7] Alternatively, the State contends that Balderas's claim fails on the merits.

¶28    Even if we assume that Balderas's claim is not forfeited, we agree with the State that it fails on the merits. Detective Ojdana's body camera footage

---

[7] As the State observes, Balderas did not discuss his *Brady* claim in his postconviction motion. We note, however, that Balderas referenced *Brady* in his postconviction argument, and in his motion for reconsideration.

is neither exculpatory nor material as it does not contain the contents of Bailey's post-trial statement or what she witnessed. Moreover, Bailey's statement itself is not exculpatory. As discussed above, Bailey testified that she did not actually see Balderas shoot E.B. or hear any discussion between the two. Thus, Balderas cannot show that there is a ***Brady*** violation entitling him to a new trial. *See Wayerski*, 385 Wis. 2d 344, ¶35.

## II. Castle Doctrine

¶29    Balderas argues that the circuit court erred in not instructing the jury as to the castle doctrine. Balderas also argues this instruction should have been given when the jury inquired about self-defense.

¶30    WISCONSIN STAT. § 939.48 addresses self-defense. Wisconsin's castle doctrine is codified in § 939.48(1m)(ar), which provides:

> If an actor intentionally used force that was intended or likely to cause death or great bodily harm, the court may not consider whether the actor had an opportunity to flee or retreat before he or she used force and shall presume that the actor reasonably believed that the force was necessary to prevent imminent death or great bodily harm to himself or herself if the actor makes such a claim under sub. (1) and either of the following applies:
>
> 1. The person against whom the force was used was in the process of unlawfully and forcibly entering the actor's dwelling, motor vehicle, or place of business, the actor was present in the dwelling, motor vehicle, or place of business, and the actor knew or reasonably believed that an unlawful and forcible entry was occurring.
>
> 2. The person against whom the force was used was in the actor's dwelling, motor vehicle, or place of business after unlawfully and forcibly entering it, the actor was present in the dwelling, motor vehicle, or place of business, and the actor knew or reasonably believed that the person had unlawfully and forcibly entered the dwelling, motor vehicle, or place of business.

11

¶31 Balderas acknowledges that the Wisconsin Judicial Conference Criminal Jury Instructions Committee's note indicates that the presumption in WIS. STAT. § 939.48(1m)(ar) does not change the substance of the existing privilege of self-defense or create an alternative to the existing privilege. *See* WIS JI—CRIMINAL 805A. Rather, it only affects what a defendant must show to have the privilege of self-defense submitted to the jury. *Id.* Balderas nonetheless appears to contend that the Committee was wrong and the castle doctrine is available to be provided to the jury.

¶32 Even if we were to assume that the Committee is wrong and a castle doctrine instruction was available to provide to the jury—and we empathize we are not drawing that conclusion here—Balderas's arguments are forfeited.

¶33 Balderas raises his castle doctrine claim for the first time in this court. "It is well-established law in Wisconsin that those issues not presented to the [circuit] court will not be considered for the first time at the appellate level." *Shadley v. Lloyds of London*, 2009 WI App 165, ¶25, 322 Wis. 2d 189, 776 N.W.2d 838. Balderas did not raise this issue in his postconviction motion, and there is no indication in the record that Balderas's trial attorney requested a castle doctrine instruction or otherwise objected to the self-defense instruction provided. Nor does Balderas allege that any such objection was made off-the-record during the trial. The failure to object "constitutes a [forfeiture] of any error in the proposed instructions," *see* WIS. STAT. § 805.13(3), and this court "has no power to reach an unobjected-to jury instruction," *see State v. Trammell*, 2019 WI 59, ¶25, 387 Wis. 2d 156, 928 N.W.2d 564.

¶34 Moreover, during deliberations, when the jury asked about self-defense, Balderas's trial attorney specifically requested that the circuit court

instruct the jury to read the jury instructions, and the circuit court agreed. A party cannot request that a court take a specific action and then complain on appeal when the court adopted the party's position. *See Shawn B.N. v. State*, 173 Wis. 2d 343, 372, 497 N.W.2d 141 (Ct. App. 1992).

¶35 Balderas suggests that he could not forfeit his challenge because the Committee note prevented an objection at trial. Balderas cites no legal authority in support of this argument, and it is unclear why a challenge to the Committee note could not be raised at the trial court level to preserve it for appellate review, or in his postconviction motion. Thus, we conclude that Balderas forfeited any challenge to the jury instructions.

## III.   Constitutionality of the Trial

¶36 Lastly, Balderas contends that his trial was unconstitutional "for lack of fairness and due process." As the State suggests, this appears to be nothing more than a rehash of his previous arguments. In his argument, Balderas states that Bailey's testimony was material and was not cumulative, refers to the absence of the castle doctrine instruction, and contends that the failure to turn over Detective Ojdana's body camera footage was a *Brady* violation. As discussed above, all of Balderas's claims fail. Recasting these arguments as constitutional claims does not change our conclusion that Balderas is not entitled to relief.

¶37 Therefore, for all of the reasons above, we reject Balderas's arguments and affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.